LYONS & FLOOD, LLP
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

Attorneys for Plaintiff
KYODO SHIPPING, LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KYODO SHIPPING, LTD., | |
| Plaintiff, | |
| -against- | 09 Civ. |
| GROUPAMA TRANSPORT S.A., ASSICURANZIONI GENERALI - UK, ASSICURANZIONI GENERALI SPA - UK, REMBRANDT INSURANCE COMPANY, INTERNATIONAL INSURANCE COMPANY OF HANNOVER LTD., and TRYGVESTA FORSIKRING A/S, | **VERIFIED COMPLAINT** |
| Defendants. | |

Plaintiff KYODO SHIPPING, LTD. ("KYODO"), by its attorneys, Lyons & Flood, LLP, as

and for its Verified Complaint against defendants, GROUPAMA TRANSPORT S.A.

("GROUPAMA"), ASSICURANZIONI GENERALI - UK ("AG"), ASSICURANZIONI

GENERALI SPA - UK ("AGS"), REMBRANDT INSURANCE COMPANY ("REMBRANDT"),

INTERNATIONAL INSURANCE COMPANY OF HANNOVER LTD. ("HANNOVER"), and

TRYGVESTA FORSIKRING ("TRYG") (collectively referred to as "DEFENDANT CO-

INSURERS"), alleges upon information and belief as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and the action falls within the Court's subject matter jurisdiction

pursuant to 28 USC §§ 1331 and 1333.

2.      At all material times, plaintiff KYODO was and still is a corporation organized and existing under the laws of a foreign country, with an office and place of business in Ground Floor, Barbour Centre, P.O. Box 1569, Georgetown, Grand Cayman, KY1-1110, Cayman Islands, and was the owner of the M/V KYODO YARROW, a liquid gas tanker formerly known as the M/V SIGAS YARROW ("the Vessel").

3.      Upon information and belief, at all material times, defendant GROUPAMA was and still is a corporation organized and existing under the laws of a foreign country, with an office and place of business at 1 quai George V – BP1403 – France, 76067 Le Havre Cedex, and was a co-insurer under the subject all-risk hull insurance policy for the Vessel (the "Policy," Cover Note dated May 16, 2006, and Endorsement to Cover Note dated September 26, 2007, attached as Exhibit A). Under the terms of the Policy, defendant GROUPAMA was the insurer for 20% of the coverage.

4.      Upon information and belief, at all material times, defendant AG was and still is a corporation organized and existing under the laws of a foreign country, with an office and place of business at 100 Leman Street, London E1 8AJ, England and was a co-insurer under the Policy. Under the terms of the Policy, defendant AG was the insurer for 15% of the coverage.

5.      Upon information and belief, at all material times, defendant AGS was and still is a corporation organized and existing under the laws of a foreign country, with an office and place of business at 100 Leman Street, London E1 8AJ, England and was a co-insurer under the Policy. Under the terms of the Policy, defendant AGS was the insurer for 10% of the coverage.

6.      Upon information and belief, at all material times, defendant REMBRANDT was and still is a corporation organized and existing under the laws of a foreign country, with an office and place of business c/o Cedar Management, Continental Building, 25 Church Street, P.O. Box

HM824, Hamilton HM CX, The Bermudas, and was a co-insurer under the Policy. Under the terms of the Policy, defendant REMBRANDT was the insurer for 5% of the coverage.

7.     Upon information and belief, at all material times, defendant HANNOVER was and still is a corporation organized and existing under the laws of a foreign country, with an office and place of business at Hantverkargatan 25, P.O. Box 22085, 10422 Stockholm, Sweden, and was a co-insurer under the Policy. Under the terms of the Policy, defendant HANNOVER was the insurer for 20% of the coverage.

8.     Upon information and belief, at all material times, defendant TRYG was and still is a corporation organized and existing under the laws of a foreign country, with an office and place of business at Klausdalsbrovej 601, DK-2750 Ballerup, Denmark, and was a co-insurer under the Policy. Under the terms of the Policy, defendant GROUPAMA was the insurer for 30% of the coverage.

9.     Under the terms and conditions of the Policy, DEFENDANT CO-INSURERS were collectively obligated to insure the hull and machinery of the Vessel for any damage resulting from marine perils that occurred during the relevant policy period. The Policy became effective on May 1, 2006, and ran through November 1, 2007.

10.     The Policy is subject to the Norwegian Marine Insurance Plan of 1996, which provides that policies covering marine perils cover "all perils to which the interest may be exposed, with the exception of . . . perils covered by an insurance against war perils . . . intervention by a State Power . . . insolvency . . . [and] perils covered by the RACE II clause . . ." Plaintiff KYODO's claim under the Policy involves a covered marine peril.

11.     On October 3, 2007, the Vessel suffered an engine breakdown while carrying cargo between Lake Charles, Louisiana and Altamira, Mexico and had to be towed to a port of refuge for

repair work. According to the marine surveyors, the cause of the engine breakdown was the insufficient lube oil supplied to cylinder no. 7 and its adjoining bearings. The lack of lube oil was due to the bent condition of the internal parts of cylinder no. 7. The engine breakdown was not caused by contaminated lube oil. The cost of repairs to the engine and related expenses total $1,257,757.00, as nearly as now can be calculated. Plaintiff insurable loss under the Policy is therefore $1,257,757.00.

12.    Immediately after the engine breakdown, plaintiff KYODO notified DEFENDANT CO-INSURERS of the incident. On October 15, 2007, plaintiff demanded that the DEFENDANT CO-INSURERS reimburse it for the insurable loss for the repair and related costs stemming from the engine breakdown. DEFENDANT CO-INSURERS have thus far denied coverage under the Policy.

13.    Plaintiff KYODO has thereby incurred losses of $1,257,757.00, as nearly as now can be calculated, as a result of DEFENDANT CO-INSURERS' breach of the Policy.

14.    Pursuant to the Norwegian Marine Insurance Plan, disputes between plaintiff KYODO and DEFENDANT CO-INSURERS under the Policy are subject to Norwegian law and Danish litigation.

15.    Plaintiff KYODO has commenced litigation against DEFENDANT CO-INSURERS in the Danish Maritime and Commercial Court (see KYODO's Danish Claim Submission attached as Exhibit B and DEFENDANT CO-INSURERS' Statement of Defence attached as Exhibit C).

16.    Under Norwegian law, plaintiff would expect a Danish tribunal to award interest on the principal amount awarded at a rate of approximately 7.5%. Plaintiff has therefore calculated interest on the sums set forth in paragraph ¶ 23 of the Verified Complaint herein based on that interest rate.

17.    Under Norwegian law, plaintiff would also expect a Danish tribunal to award the legal costs of litigation against DEFENDANT CO-INSURERS. These legal costs would include plaintiff's legal fees, experts' fees, and attorneys' fees in relation to the tribunal hearing, costs associated with the hearing itself, and travel costs and expenses for witnesses attending the hearing.

18.    DEFENDANT CO-INSURERS cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure, but upon information and belief, DEFENDANT CO-INSURERS have, or will have during the pendency of this action, property within this District and subject to the jurisdiction of this Court held in the hands of garnishees, which are believed to be due and owing to DEFENDANT CO-INSURERS.

19.    It is the common practice of foreign entities engaged in maritime transactions to make and receive payments via U.S. dollar denominated electronic funds transfers.

20.    Due to the requirement that foreign banking institutions must have a relationship with a correspondent bank in the U.S. in order to send or receive U.S. dollar denominated electronic funds transfers, virtually all such transfers pass through the hands of garnishees in New York, since such garnishees represent nearly all of the major correspondent banks.

21.    Under the terms of the Policy, payments thereunder are to be made in U.S. Dollars (see p. 5 of Exhibit B). Upon information and belief, DEFENDANT CO-INSURERS have similar insurance policies under which payments are made in U.S. Dollars.

22.    Therefore, further U.S. dollar payments made by DEFENDANT CO-INSURERS are expected to be made via electronic funds transfers passing through the hands of garnishees within this District.

23.    Plaintiff KYODO hereby demands:

(a) Payment of $1,257,757.00 as security for the repair and related costs plaintiff incurred as a result of CO-DEFENDANT INSURERS' collective failure to pay under the terms of the Policy;

    i. Defendant GROUPAMA is liable in the amount of $251,551.40, or 20% of the total, plus interest under the terms of the Policy;

    ii. Defendant AG is liable in the amount of $188,663.55, or 15% of the total, plus interest under the terms of the Policy;

    iii. Defendant AGS is liable in the amount of $125,775.70, or 10% of the total, plus interest under the terms of the Policy;

    iv. Defendant REMBRANDT is liable in the amount of $62,887.50, or 5% of the total, plus interest under the terms of the Policy;

    v. Defendant HANNOVER is liable in the amount of $251,551.40, or 20% of the total, plus interest under the terms of the Policy; and

    vi. Defendant TRYG is liable in the amount of $377,327.10, or 30% of the total, plus interest under the terms of the Policy.

(b) Payment of $314,082.52 as security (in proportion to the foregoing percentage of risk for each defendant) to cover interest on the amount in paragraph (a) above as recoverable under Norwegian law.  Plaintiff reserves the right to amend the demand herein in the event the amount in paragraph

(a) above increases over time; and

(c) Payment of $125,000.00 as security (in proportion to the foregoing percentage of risk for each defendant) to cover the legal costs in connection with the Danish litigation as recoverable under Norwegian law. Plaintiff reserves the right to amend the demand in the event the legal costs increase over time.

**Total $1,696,839.52**

WHEREFORE, plaintiff KYODO SHIPPING, LTD., prays that:

a.      process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against DEFENDANT CO-INSURERS citing them to appear and answer under oath all and singular the matters alleged;

b.      since DEFENDANT CO-INSURERS cannot be found within this District, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, attaching all of the DEFENDANT CO-INSURERS' tangible or intangible property in this District or claimed by or being held for, belonging to, due or being transferred to, from, or for the benefit of DEFENDANT CO-INSURERS by any garnishees within this District, in the collective amount of $1,696,839.52 to secure plaintiff KYODO's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged;

c.      this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary;

d.      judgment be entered by this Court in favor of plaintiff and against DEFENDANT

CO-INSURERS enforcing and recognizing any Danish tribunal award(s) or judgment(s) that may

be rendered on the claims set forth herein; and

e.     plaintiff has such other, further, and different relief as this Court may deem just and

proper.

Dated: September 30, 2009
        New York, New York

LYONS & FLOOD, LLP
Attorneys for Plaintiff
KYODO SHIPPING, LTD.

By:

Kirk M. Lyons
Jon Werner
Michael A. Namikas
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

U:\kmhldocs\2686002\Legal\Verified Complaint.doc

## VERIFICATION

Michael A. Namikas, the undersigned, an attorney admitted to practice in this Court, state that I am the attorney of record for plaintiff KYODO SHIPPING, LTD., in the within action; I have read the foregoing Verified Complaint and know the contents thereof; the same is true to my knowledge based on documents in my file, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

The reason this Verification is made by me and not an officer of plaintiff KYODO SHIPPING, LTD., is because there are no officers now present in this District.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on:   September 30, 2009
             New York, New York


_____
Michael A. Namikas

U:\kmhldocs\2686002\Legal\Verified Complaint.doc

# EXHIBIT A

*Bilag* \

1A

GORRISSEN FEDERSPIEL KIERKEGAARD

P O L A R I S
INSURANCE BROKERS AS

TESMA UK Ltd.
3 Commercial Quay,
80 Commercial Street, Leith
Edinburgh, EH6 6LX,
UNITED KINGDOM

Oslo, mai. 16, 2006

Attachment    01.05.2006
Expiry        30.04.2007

# Cover Note

## No. 2006082

| INTEREST | HULL & MACHINERY |
| FLEET NAME | TESMA UK Ltd. |

**ORDER HEREON**    100,000000 %

| Vessel - name | IMO | Curr | Sum insured | Rate % |
|---|---|---|---|---|
| SIGAS YARROW | 9002951 | USD | 3 600 000 | 1,8861700 |

**DEDUCTIBLES**

H&M Deductible = USD   75 000
Ice Deductible = USD   50 000
Coll. Deductible = USD   50 000
Machine Deductible = USD   37 500

**PERIOD**    : 18 months with effect from 1st May, 2006    (in respect of 70% placing)
15 months with effect from 1st May, 2006    (in respect of 30% Placing)

**CONDITIONS**    : Subject to full conditions for Hull Insurance as per §10-4 of the Norwegian Marine
Insurance Plan of 1996 (version 2003) Chapters 1 - 13, but with special
conditions as follows:

| | | |
|---|---|---|
| § 12-18 : | Particular Average Deductible : | As attached. |
| § 12-16 : | In respect of vessels built 1991 or before, a deductible of 50% of §12-18 deductible is charged. | |
| § 12-15 : | Additional Ice Damage Deduction  : | Usd    50,000 |
| § 13- 4 : | Collision and Striking Liability Deductible : | Usd    50,000 |

Combined Deductible (§12-18 & §13-4) not to exceed the amount stated in §12-18.

General Average Absorption Amount as per section 4-8.a, :
Usd 250,000   in respect of the "OBO" vessels.
Usd 100,000   in respect of all other vessels.

In the event of a casualty separately to any of the objects insured under the Plan's
section §10-1(b) (Equipment onboard and spare parts) without any damage to, or
consequence for the vessel herself, such damage or loss shall be subject to a
special Deductible of Usd 5,000 for each casualty.

Objects temporarily removed from the vessel §10-2 :
The insurance includes parts of the vessel's equipment and spare parts which are
temporarily removed from the vessel for storage, repairs, rebuilding or similar
Work, also during transport from and to the vessel.

Institute Radioactive Contamination , Chemical, Biological, Bio-Chemical and
Electromagnetic Weapons Exclusion Clause (Cl. 370 10/11/03) as attached.
Institute Cyber Attack Exclusion Clause (Cl. 380 10/11/03) as attached.



**P O L A R I S**
INSURANCE BROKERS AS

TESMA UK Ltd.
3 Commercial Quay,
80 Commercial Street, Leith
Edinburgh, EH6 6LX,
UNITED KINGDOM

Oslo, mai. 16, 2006

**Attachment**    01.05.2006
**Expiry**    30.04.2007

# Cover Note

## No. 2006082

All claims &/or losses &/or payments hereunder shall be presented by the
Technical manager, and Insurers are authorised to effect settlement
of such claims &/or losses &/or payments to Polaris Insurance Brokers AS,
which shall constitute a full and complete settlement to the individual named
Owner &/or Assured &/or Co-Assured.
This clause shall not override any provisions contained in any Loss Payable
Clause in favour of the Mortgagees.

The Mortgagees are covered hereunder in accordance with Chapter 7 of the Plan.

Claims lead : Tryg Forsikring A/S, Copenhagen.

Adjustments hereunder to be made by Average Adjuster Bjørn Slaatten or if
decided between Claims Lead and Polaris by Peter Gillis de Besche as Claims
Adjuster, and their adjustments to be followed in every respect subject approval
by Tryg Forsikring A/S as Claims Leader.

**INSURED WITH**

| | | |
|---|---|---|
| 20% | Cap-Marine Assurances & Reassurances SA | |
| | 20% | Groupama Transport SA. |
| 30% | JLT Risk Solutions Ltd. | |
| | 15% | Assicuranzioni Generali - UK |
| | 10% | Assicuranzioni Generali Spa - UK |
| | 5% | Rembrandt Insurance Company. |
| 20% | London Special Risks Ltd. | |
| | 20% | International Insurance Comp. of Hannover Ltd. |
| 30% | Tryg Forsikring | |
| 100% | Total | |

Polaris Insurance Brokers AS

Page 2 of 2

# EMS Insurance Brokers AS

1B

EMS Ship Management (UK) Ltd.
3 Commercial Quay,
80 Commercial Street, Leith
Edinburgh, EH6 6LX,
UNITED KINGDOM

ORIGINAL

Oslo, sep. 26, 2007

## Endorsement

to

### Cover Note: 2006082 / 2006


| | | |
|---|---|---|
| VESSEL INSURED | : | KYODO YARROW |
| ASSURED | : | EMS SHIP MANAGEMENT (UK) LTD. |
| INTEREST | : | HULL & MACHINERY |
| ORDER HEREON | : | 100,00000 % |
| ENDORSEMENT | : | No.1 |

Underwriters have noted that "SIGAS YARROW" was sold to Kyodo Shipping Ltd., Cayman Islands and renamed "KYODO YARROW" at 03:00 hrs. gmt. on the 24th August, 2007 and agree to continue coverage hereon as follows :

ASSURED :  Kyodo Shipping Ltd., Cayman Islands

CO-ASSURED :  Kyodo Corporation Japan.
Nepa Projects & Investments Ltd.
EMS Ship Management (UK) Ltd.          (as Technical Manager).
EMS Crew Management AS.                (as Crew Manager).

MORTGAGEE :  Tokyo-Mitsubishi UFJ, Ebisu Branch.
including the attached Notice of Assignment.

SUM INSURED :  USD 5,440,000

CONDITIONS :  As per Fleet Conditions except excluding RDC & FFO entirely.

DEDUCTIBLE :  Sect. 12-18 - Particular Average Deductible    USD 75,000
Sect. 12-15 - Additional Machine Deductible   USD 37,500
Sect. 12-16 - Additional Ice Damage Deductible   USD 50,000

RATE :      1.1904471% p.a. and pro rata for period.

In consideration of the above, a pro rata adjustment in premium is due.

Page 1 of 2

Kronprinsensgt 1, 0251 Oslo, Norway
Tel: +47 22 01 94 70, e-mail: insurancebrokers@ems-asa.com · www.ems-asa.com
ORG no. 876 312 352



EITZEN GROUP
Est. 1883

# EMS Insurance Brokers AS

2B

EMS Ship Management (UK) Ltd.
3 Commercial Quay,
80 Commercial Street, Leith
Edinburgh, EH6 6LX,
UNITED KINGDOM

Oslo, sep. 26, 2007

## Endorsement

to

### Cover Note: 2006082 / 2006

All other terms, clauses and conditions remain unaltered.

EMS Insurance Brokers AS

Page 2 of 2

Kronprinsensgt 1, 0251 Oslo, Norway
Tel: +47 22 01 94 70, e-mail: insurancebrokers@ems-asa.com · www.ems-asa.com
ORG no. 876 312 352



EITZEN GROUP
Est. 1883

3B.

### NOTICE OF ASSIGNMENT

#### (for attachment by way of endorsement to the Policy)

We, KYODO SHIPPING LIMITED, CAYMAN ISLANDS the Owner of m.v. KYODO YARROW (the "Vessel") HEREBY GIVE NOTICE that by a General Assignment dated 20TH AUGUST 2007 made by us in favor of The bank of Tokyo-Mitsubishi UFJ, Ebisu Branch - Address 8-6 Ebisu Nishi, 1 Chome Shibuya-Ku, Tokyo, Japan (the "Mortgagee") there has been assigned by us to the Mortgagee as mortgagee of the said Vessel all insurances in respect thereof, including the insurances constituted by the Policy whereon this Notice is endorsed.

Dated 10TH AUGUST 2007

For and on behalf of

By: _____

Name: EI GOKITA
Title: DIRECTOR

AFTER 3B FOLLOWED.

4B = 4A
5B = 5A
6B = 6A.

9/5/62008

# EXHIBIT B

*In-house translation*

# Statement of Defence

Case                    Maritime and Commercial Court of Copenhagen
                        S-0035-08

                        Kyodo Shipping Ltd.
                        Ground Floor, Barbour Centre
                        P.O. Box 1569, Georgetown
                        Grand Cayman, KY1-1110
                        Cayman Islands
                        *(attorney Peter Appel)*

v.                 1)   TrygVesta
                        Klausdalsborvej 601
                        2750 Ballerup

                   2)   Groupama Transport SA
                        2, quai George V, BP 1403
                        Le Havre Cedex 76067, France

                   3)   Assicuranzioni Generali-UK
                        100 Leman Street
                        London E1 8AJ, England

                   4)   Assicuranzioni Generali-UK
                        100 Leman Street
                        London E1 8AJ, England

                   5)   Rembrandt Insurance Company
                        c/o Cedar Management
                        Continental Building
                        25 Church Street, PO Box HM824
                        Hamilton HM CX, Bermuda

                   6)   International Insurance Comp. of Hannover
                        Hantverkargatan 25
                        P.O. Box 22085
                        10422 Stockholm, Sweden

I appear on behalf of the defendants and make the following

845562-1 PA VIJ 31.03.2009

*In-house translation*

1.    **CLAIMS**

1.1    **Primary claim**
Rejection of the plaintiff's claim.

1.2    **Alternatively**

Payment of a lesser amount than claimed.

2.    **THE HULL INSURANCE**

The defendants agree that they as co-insurers and with defendant 1 as principal underwriter and claims head had taken out hull insurance on the plaintiff's vessel KYODO YARROW at the time of the average in accordance with the Cover Note produced (exhibit 1).

The defendants further agree that the policy was taken out pursuant to Norwegian Marine Insurance Plan of 1996, version 2003 (hereinafter "NSPL").

Finally, the defendants agree that Norwegian law applies, cf. NSPL sections 1-4, and that legal proceedings under the hull insurance shall be commenced in Denmark which is the jurisdiction of the principal underwriter's domicile.

3.    **THE CAUSE OF THE AVERAGE**

3.1    **Defendant 1's observations**

Defendant 1 does not agree that the average can be attributed to an alleged deformation of the crankshaft.

Defendant 1's surveyor, chief inspector Michael Skipper, was advised of the average and participated in the joint survey on 10 October 2007 in Port Altamira, Mexico, and in the subsequent survey on 21 October 2007 and the following days in Corpus Christi, Texas.

At these surveys the parties ascertained that the engine had suffered a major average with substantial damage to the engine parts, including the crankshaft.

845562-1 PA VIJ 31.03.2009

It was also agreed that the damage occurred at cylinder no. 7 where substantial turns of bearing shells were established and with clear indications of the immediate cause being a lack of supply of lub oil.

At these surveys defendant 1's surveyor drafted a survey report dated 12 October 2007 in connection with the survey in Port Altamira (**exhibit A**) and survey report of 25 October 2007 in connection with the survey in Corpus Christi (**exhibit B**).

In the latter report the following is concluded as to the cause of damage:

> "*Cause of damage:*
> *The cause for the average of the main engine crankshaft is caused by a turning main bearing on main journal # 7.*
> *The lack of oil flow caused by the turned bearing shells was leading to follow damage of the unit's piston and liner is to be anticipated related to the condition of the main engine lubrication oil condition.*
>
> *Conclusion:*
> *From the information obtained and my observations, I conclude, that the main engine crankshaft average is related to component failure caused by combustion insolubles accumulated in the oil.*
>
> *The blot by score marks on the various pistons are not related to the average but related to earlier incidents of poor performance of the main engine.*
>
> *The wear down of the intermediate shaft bearing is not related to the average.*"

In connection with the latter survey it was further recommended that a particle analysis should be made of the lub oil.

Later on the defendant received various documents to further illustrate the cause of the average, including information on the lub oil routines.

It appeared from this information that the lub oil had constantly been extremely contaminated with impurities and particles with the result that the lub oil filter was constantly clogged and had to be changed.

*In-house translation*

Reference is made to the plaintiff's purchase of lub oil filters for the vessel in the period from February 2006 until April 2007 (**exhibit C**) showing regular purchases of filters corresponding to a consumption of approximately 2,000 in the period in question compared to a usual yearly consumption of 25-50.

The very extraordinary and totally unusual clogging of the oil filters provides clear and unambiguous evidence of considerable impurities in the lub oil exposing the engine to an imminent risk of extraordinary wear, turns, clogging of lub oil supplies, etc. which most likely causes a subsequent engine average.

At the surveys it was agreed to make a particle analysis of the lub oil. In this respect the chief engineer and the owners' superintendent took a sample on 21 October 2008 which hereafter was sent for analysis at Saybolt International Laboratories.

The result of this analysis shows a particle concentration of 28/25 (ISO 4406). The analysis only comprised the two first figures as the oil was so contaminated that an analysis was not made in respect of the third figure. It appears from the ISO 4406 chart (**exhibit D**) that an analysis result of 28/25 indicates such an extreme particle concentration that it falls outside the specifications of the chart of when the oil is not fit for use in every respect (22/20).

Not surprisingly the conclusion of the analysis was that the oil is *"not suitable for any oil, hydraulic or gear systems"*.

The comment that the sample was diluted solely reflects that Saybolt has diluted the sample prior to analysis thereof, but this is not important in respect of the readings obtained where this is obviously taken into consideration when stating the results.

It is contested that anything should support that this oil sample is not true and fair, irrespective of it being labelled *"unsealed"*. As mentioned, the sample was taken by the engine crew of the vessel under supervision of the owners' superintendent and Michael Skipper. Michael Skipper took the sample into his custody and personally brought it to Saybolt for analysis.

Defendant 1's surveyor drafted supplemental survey reports based on the additional information received – report of 10 December 2007 (**exhibit E**) and report of 14 March 2008 (**exhibit F**).

845562-1 PA VIJ 31.03.2009

Based on the supplemental information more specific conclusions as to the cause of the average could be drawn as it appears from the latest report (exhibit F) where it is concluded on page 5:

> "*From the information obtained and my observations, I conclude, that the main engine crankshaft average is related to component failure caused by combustion insolubles accumulated in the Main Engine lubrication oil.*
>
> *The consequences by operation of an engine with significant clogging of filters in various sizes result in premature engine operation problems in particular with such components as main and bottom bearings.*
>
> *The Main Engine bearing break down aught to have been avoided since the Technical Department had the full knowledge of the unusual enormous consumption of lubrication oil filter elements. The consciousness of the vessels technical condition through correspondence and had been involved in the water contamination of the vessels various oil lubricated systems.*"

**3.2    Lub oil samples**

With reference to the lub oil analyses made the plaintiff has claimed that the lub oil was always suitable for use and with reference to this has claimed that poor lub oil did not cause the average.

In defendant 1's opinion there is no evidence of this.

Firstly, the lub oil samples produced by the plaintiff (exhibit 14) were all taken <u>after</u> the average and does thus not show in any way whether the lub oil used in the period prior to the average was as prescribed.

Secondly, lub oil samples taken <u>prior</u> to the average show considerable degrees of unsatisfactory lub oils.

Thus, the lub oil sample taken on 25 August 2007 (**exhibit G**) shows that the oil contained a much too high concentration of water which is an indication of substantial leaks.

The following comment was made in respect of this lub oil sample:

"*C1 – Oil contains excessive amount of water. Source of water ingress should be located and rectified. It is advised to remove water asap (preferably by purification at 95°C). If water cannot be readily removed the oil should be replaced with fresh oil.*"

In the same way the lub oil samples taken on 15 July 2007 (**exhibit H**) show that the flash point of the lub oil was below 190 which is due to bunkers oil contamination. This analysis thus concludes:

"*Low flash point indicates fuel contamination. Source of fuel leakage should be located and corrected, if possible. A low flash point is always a potential danger.*"

The plaintiff is **requested (1)** to document which measures were initiated in reply to these analysis results.

Thirdly, the analyses in question solely comprise an analysis of the quality and composition of the lub oil, but however not a particle analysis.

In respect of the extreme clogging of the filters it was highly required to make continuous analyses of the extent of particles in the lub oil as well as analysis of the nature of the particles. This partly to avoid that a lub oil containing too many particles was supplied to the engine, and partly so that the owners could initiate a thorough analysis of the cause of the extreme particle figure and impurities and thus be able to take the necessary steps in order to avoid damage.

The plaintiff is **requested (2)** to produce all oil analysis samples from the analyses made since the vessel was taken over by the plaintiff, both samples taken prior to centrifuge as well as after centrifuge.

3.3    **Analysis made by Pon Power A/S**

As a result of the disagreement between the parties about the cause of the engine average defendant 1 suggested that the actual circumstances be presented to the local service manager of the engine manufacturer MAK, Pon Power A/S, for the purpose of a definitive analysis of the cause of the average.

The owners did however not wish to participate in such a joint inquiry.

Reference is made to the parties' correspondence of 29 and 30 January 2008 (**exhibit J**).

Defendant 1 chose to present the case to Pon Power A/S itself and presented, inter alia, the repair report drafted by Hugo Stamp and the exhibits of the case, including all reports made, so that Pon Power A/S had an objective and balanced picture of the extent of the average, the necessary repairs and the parties' perception of the possible cause of the damage.

With report of 31 March 2008 (**exhibit K**) Pon Power A/S made its assessment of the cause of the damage and reached the following conclusion:

> "*We have discussed the report regarding the displacement of the crankshaft and the "bend" of the same. This could have contributed to the damage, however, it could also be a consequential damage. We do not believe this to be replaced to the highly placed intermediate bearing. This mainly inflicts on main bearings 2 and 3, and in extreme cases it will be visible on the fitted bearings' pressure flanges. Furthermore, minor wear on the upper shells on the last main bearings is not a seldom phenomenon.*
>
> *We see this incident – breakdown of main bearing no. 7 – mainly as the result of dirt in the lub. oil (which has slowly destroyed the running layer). Furthermore, it is obvious that the lub. oil flow was interrupted on some occasions, when all the filter changes, dobble fine filter on the engine, took place. This also has contributed to the breakdown of the bearings.*"

As it appears, Pon Power A/S rejects that the average could have been caused by a deformation of the crankshaft. In support hereof it is concluded that such deformations would primarily lead to strain on main bearings 2 and 3 whereas an average of main bearing no. 7 cannot be attributed to such circumstances.

At the same time it is concluded that the average must be attributed to lack of supply of lub oil caused by the owners having allowed contaminated lub oil – inter alia in connection with the many filter changes – to be supplied to the engine.

Defendant 1 ascribes crucial importance to this report from Pon Power A/S with respect to assessing the cause of the damage as the company in question is not only

entirely neutral in relation to the parties of the case, but does also have the largest competence to assess causes of averages in MAK engines.

**3.4**   **Deformation of crankshaft**

It is noted that the plaintiff's main allegation is that the average can be attributed to a deformation of the crankshaft, of which the plaintiff was not and ought not to have been aware.

It is contested that there is any evidence substantiating this claim.

<u>Firstly</u>, it is noted that automatic log measurements made in connection with a minor average in March 2006 showed that the crankshaft in question was not distorted.

There is thus a strong assumption against such deformation having occurred in the intervening period without there being any external effects at all being the reason for this.

Copies of the continuous auto log measurements in the period October 2005 / August 2007 are produced as **exhibit L**.

<u>Secondly</u>, such deformation would <u>not</u> have resulted in an average of main bearing no. 7, but on the contrary on main bearing nos. 2 and 3, cf. the conclusion of Pon Power A/S.

<u>Thirdly</u>, it is noted that the deformation which can be established on the crankshaft has most likely been caused by the actual average in October 2007, and this deformation is thus not the cause of the average, but the consequences hereof.

**3.5**   **Technical management**

**3.5.1**   It is noted that at the time of the average the vessel was in technical management with the firm Tesma UK Ltd.

As far it is understood, the owners have raised a claim against the technical manager in question, inter alia as a result of this average, with the reference that the manager did not perform the necessary due diligence in order to avoid the average.

845562-1 PA VIJ 31.03.2009

The dispute between the owners and Tesma UK Ltd. is pending by arbitration proceedings in London.

The plaintiff is **requested (3)** to produce pleadings and submitted exhibits in connection with this arbitration case as it must be presumed that these may further illustrate the cause of the damage, and not least why lub oil containing an extreme amount of impurities was allowed to be used for more than one year.

3.5.2   It further appears that the engine crew of the vessel was fully aware that the frequent change of the filters presented a problem. Thus, the need for these changes of the oil filters is described several times daily in the chief engineer's handing/taking over report of 31 August 2007 (**exhibit M**). Under item 2 it is, inter alia, stated:

> "LO Auto Backflush filters – It is essential to keep the engine load as high as possible, otherwise you get rapid fouling of the lub oil because of blow-by. This is an inherent flaw with the installation. Generally, use cleaned filters during the day & instll new cartridges for overnight UMS periods. I have just ordered more filters, /YARR0217U07), so you should have plenty for now, but keep a good eye on the ROB & order new ones in good time. As mentioned elsewhere, it's vital that you keep the LO Purifier in operation whilst at sea."

Apparently, irrespective of this no one felt induced to solve the underlying problem, but just accepted that the filters clogged all the time and had to be changed.

The plaintiff is **requested (4)** to produce all of the chief engineers handing/taking over reports from 2006 and 2007.

3.5.3   The fact that it was established that the lub oil was filled with impurities cannot be solved through purification alone as claimed by the plaintiff.

When the oil contains so many particles it ought to be changed as it presents evident danger and risk to the main engine.

It is added that each time the filters are changed the result has been that the lub oil has been supplied to the engine without this filtration and this has undoubtedly in itself led to many impurities and particles having been supplied to the cylinders with the consequential risk of clogging of the lub oil supply, turns of bearings, etc.

This is also confirmed by Pon Power A/S which states in the report of 31 March 2008 (exhibit k), page 2:

> "*In the last month before the damage (September 2007), the main engine double filter was cleaned/changed at least X times (estimated around 600 times in the last 3 months). Some days it was changed up to 48 times (according to the report) when the engine was running. If the filter bowl has not been cleaned properly each time and air vented accordingly, it is possible that a handful of dirt and some litres of air may have entered the main engine lub. oil distribution pipe, causing wear and a breakdown in the lub. oil flow for a moment.*"

3.5.4    The plaintiff has claimed that the many particles in the lub oil which led to the regular clogging of the oil filters are solely due to combustion solid particles as a result of the owners' choice of increased cylinder lub oil consumption.

This can solely be confirmed if an actual particle analysis of the clogged oil filters is made.

The plaintiff is **requested (5)** to inform whether such particle analyses have been made and if so to produce the result of the analysis.

In addition, it is added that contamination with combustion solid particles, in the same manner as other contamination, will result in clogging of the lub oil drains and thus present just as big a risk of engine average as other forms of lub oil contamination.

3.5.5    Finally it is noted that the engine suffered an average on 30 March 2006. The details appear from survey report of 2 May 2006 from TrygVesta (**exhibit N**).

The parties agreed, however, that this average was not caused by an event covered by the insurance and did thus not lead to payout from the hull insurer.

The average did not require replacement of the crankshaft which was just grinded and subsequently measured in automatic log and established to be aligned.

On the other hand it is standard practice that at such an average, engine wear parts are not reused, in particular not after grinding of the crankshaft.

However, at the average in question it turned out that pistons, linings, cylinders, etc. had been reused which appears irresponsible and the result is a considerable risk of leakages, etc. which to a much larger extent raise the risk of lack of compression and thus that combustion solid particles remain in the engine and are carried on by the lub oil.

These circumstances may have contributed to the considerable lub oil contamination and have contributed to the cause of the average.

4.    **SUBMISSIONS**

4.1    A prerequisite for receiving compensation under the hull insurance is that the damage in question is caused by a so-called "sea peril", cf. NSPL sections 2-8.

The burden of proof for such sea peril having caused the substantial engine average in question rests with the plaintiff, cf. NSPL sections 2-12 (1).

It is submitted that the plaintiff has not submitted the requisite evidence that the engine average is caused by such sea peril, and already for this reason judgment should be rendered in favour of the defendants.

4.2    Next, it is submitted that it must be held to be established that the average is caused by contaminated lub oil.

Such a cause of damage is directly exempted pursuant to NSPL sections 12-5, schedule f, which states as follows:

> "(f)The underwriter does not compensate loss due to contamination of lub oil, cooling water or feed water, unless responsible precautions were taken as soon as possible after the insured, the mater or the chief engineer became aware or must be regarded as having been aware of the contamination and later three months after one of them ought to have known of the contamination."

In support hereof it is noted that it is a fact that the lub oil used was extremely contaminated with particles, which the many changes of lub oil filters clearly show.

That the damage is caused by such a lub oil contamination has been concluded not only by defendant's 1 surveyor, but also confirmed by the representative of the en-

gine manufacturer, Pon Power A/S, which in this case must be attributed crucial importance.

In addition, the owners and the engine crew were fully aware of the problems regarding the quality of the lub oil as for a period of more than one year prior to the average they had to change the lub oil filters constantly and with a frequency far beyond what is usual.

Thus the crew knew – or ought to have known – about the contamination of the lub oil which is why the average is not covered in accordance with the above quoted provision.

4.3     It is further submitted that the plaintiff acted in a very grossly negligent way by allowing continuous use over a long period of time of heavily contaminated and polluted lub oil and just changing the filters instead of investigating the cause of the lub oil contamination.

Had the plaintiff shown due care and diligence and taken the requisite precautions the damage could have been avoided.

The defendants are thus also not liable pursuant to NSPL sections 3-33.

Further it is added that the owners' superior personnel must have been aware of these lub oil problems taking into consideration the extreme costs for changing the lub oil filters which is why the gross negligence should also be attributed to this group of personnel, of which the plaintiff is to be identified, cf. NSPL sections 3-36 (2).

4.4     It is contested that there is any evidence of the average being attributable to a distorted crankshaft.

No independent expert conclusions exist in this respect as the major competent expert – namely the engine manufacturer's representative – on the contrary rejects that this could have caused the average.

This is also supported by the fact that the crankshaft was examined in Auto log shortly before the average and no circumstances could be established at this time and until the average which could have caused the distorted crankshaft.

4.5    <u>In support of the alternative claim</u> it is noted that should the court find that the average is caused partly by any deformations of the crankshaft and partly by contaminated lub oil then cooperative causes of damage exist. In that case the defendants are solely liable in damages in respect of the part of the average which can be regarded as being caused by the alleged deformations of the crankshaft, cf. NSPL sections 2-13.

5.    **THE LOSS**

5.1    It appears from the case that in connection with the average, average grosse was declared, whereby the cargo is to bear part of the average costs, especially tugboat costs and costs in port of refuge.

The plaintiff's statement of claim must be prepared in accordance herewith.

5.2    As to the interest claim it is contested that the plaintiff is entitled to interest on not yet paid costs as it follows from NSPL sections 5-4 that interest shall not be calculated until the date of outlay which is consequently the date when the outlay was paid by the plaintiff.

5.3    It is noted that the plaintiff's interest claim as worded in the claims does not form basis for an enforcement claim.

6.    **MORTGAGEE**

Defendant 1 has noted the mortgagee interest under the insurance in accordance with the Notice of Assignment produced as exhibit 1.

The plaintiff is therefore requested to obtain consent from the mortgagee that the claim for damages against the underwriter can be forwarded in the name of the plaintiff.

7.    **EXPERT APPRAISAL**

Defendant 1 requests that the case is presented to an expert appointed by the court in order to obtain a statement on the cause of the average based on the information presented in the case.

*In-house translation*

8.     **PRODUCTION OF EVIDENCE**

Defendant 1 intends to call on the following to give evidence during the main pro-
ceedings:

Chief average inspector Michael Skipper
Erik Hass, Pon Power A/S
Jan Achmann, Saybolt Danmark A/S

9.     **VAT REGISTRATION**

Defendant 1 is not VAT registered.

10.     **PROCEDURAL INFORMATION**

Procedural information, etc. to the defendants may be directed to attorney-at-law
Henrik Thal Jantzen, Kromann Reumert, Sundkrogsgade 5, 2100 Copenhagen Ø,
ref. 187315.

---oo0Ooo---

The defendants reserve their right to the greatest possible extent to make further allega-
tions, submissions, etc. of any nature.

Copenhagen, 27 March 2009
Kromann Reumert

(sign.)
Henrik Thal Jantzen

845562-1 PA VIJ 31.03.2009

# EXHIBIT C

GORRISSEN FEDERSPIEL KIERKEGAARD

**TRANSLATION**

The Danish Maritime and Commercial Court
Bredgade 70
1260 Copenhagen K
Denmark

## Writ

I represent

**Kyodo Shipping Ltd.**
Ground Floor, Barbour Centre
P.O. Box 1569, Georgetown
Grand Cayman, KY1-1110
Cayman Islands

(Attorney Peter Appel)

I hereby summon

**TrygVesta**
CVR reg. no. 19382605
Klausdalsbrovej 601
2750 Ballerup
Denmark
(The First Defendant)

(Attorney Henrik Thal Jantzen)

and

**Groupama Transport SA**
1, quai George V
BP 1403
Le Havre Cedex 76067
France
(The Second Defendant)

and

**Assicuranzioni Generali-UK**
100 Leman Street
London E1 8AJ
England
(The Third Defendant)

and

GORRISSEN FEDERSPIEL KIERKEGAARD

**Assicurazioni Generali Spa-UK**
100 Leman Street
London E1 8AJ
England
(The Fourth Defendant)

and

**Rembrandt Insurance Company**
c/o Cedar Management
Continental Building
25 Church Street
P.O. Box HM824
Hamilton HM CX
The Bermudas
(The Fifth Defendant)

and

**International Insurance Comp. of Hanover**
Hantverkargatan 25
P.O. Box 22085
10422 Stockholm
Sweden
(The Sixth Defendant)

On behalf of the Plaintiff, Kyodo Shipping Ltd., I make the following

**CLAIMS:**

**Claim 1:**

Primary:

TrygVesta be ordered to pay to the Plaintiff the amount of USD 377,327.10 plus interest pursuant to S. 5-4, 1st and 3rd sentences of the Norwegian Marine Insurance Plan of 1996 ("Norske Søforsikringsplan af 1996") (version 2003) (hereinafter "the NSPL") from the date of the disbursement for paid invoices and from the due date for unpaid invoices and until 26 June 2008 and interest pursuant to S. 5-4, 4th sentence of the NSPL from 26 June 2008 and until payment has been made, alternatively plus legal interest from the commencement of this legal action and until payment is effected.

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

Alternative:

TrygVesta be ordered to pay to the Plaintiff a smaller amount than primarily claimed at the discretion of the court.

**Claim 2:**

Primary:

Groupama Transport SA be ordered to pay to the Plaintiff the amount of USD 251,551.40 plus interest pursuant to S. 5-4, 1st and 3rd sentences of the NSPL from the date of the disbursement for paid invoices and from the due date for unpaid invoices and until 26 June 2008 and interest pursuant to S. 5-4, 4th sentence of the NSPL from 26 June 2008 and until payment has been made, alternatively plus legal interest from commencement of this legal action and until payment is effected.

Alternative:

Groupama Transport be ordered to pay to the Plaintiff a smaller amount than primarily claimed at the discretion of the court.

**Claim 3:**

Primary:

Assicuranzioni Generali-UK be ordered to pay to the Plaintiff the amount of USD 188,663.55 plus interest pursuant to S. 5-4, 1st and 3rd sentences of the NSPL from the date of the disbursement for paid invoices and from the due date for unpaid invoices and until 26 June 2008 and interest pursuant to S. 5-4, 4th sentence of the NSPL from 26 June 2008 and until payment has been made, alternatively plus legal interest from commencement of this legal action and until payment is effected.

Alternative:

Assicuranzioni Generali-UK be ordered to pay to the Plaintiff a smaller amount than primarily claimed at the discretion of the court.

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

**Claim 4:**

Primary:

Assicuranzioni Generali Spa-UK be ordered to pay to the Plaintiff the amount of USD 125,775.70 plus interest pursuant to S. 5-4, 1st and 3rd sentences of the NSPL from the date of the disbursement for paid invoices and from the due date for unpaid invoices and until 26 June 2008 and interest pursuant to S. 5-4, 4th sentence of the NSPL from 26 June 2008 and until payment has been made, alternatively plus legal interest from commencement of this legal action and until payment is effected.

Alternative:

Assicuranzioni Generali Spa-UK be ordered to pay to the Plaintiff a smaller amount than primarily claimed at the discretion of the court.

**Claim 5:**

Primary:

Rembrandt Insurance Company be ordered to pay to the Plaintiff the amount of USD 62,887.85 plus interest pursuant to S. 5-4, 1st and 3rd sentences of the NSPL from the date of the disbursement for paid invoices and from the due date for unpaid invoices and until 26 June 2008 and interest pursuant to S. 5-4, 4th sentence of the NSPL from 26 June 2008 and until payment has been made, alternatively plus legal interest from commencement of this legal action and until payment is effected.

Alternative:

Rembrandt Insurance Company be ordered to pay to the Plaintiff a smaller amount than primarily claimed at the discretion of the court.

**Claim 6:**

Primary:

International Insurance Comp. of Hannover be ordered to pay to the Plaintiff the amount of USD 251,551.40 plus interest pursuant to S. 5-4, 1st and 3rd sentences of the NSPL from the date of the disbursement for paid invoices and from the due date for unpaid invoices and until 26 June 2008 and interest pur-

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

suant to S. 5-4, 4th sentence of the NSPL from 26 June 2008 and until payment has been made, alternatively plus legal interest from commencement of this legal action and until payment is effected.

Alternative:

International Insurance Comp. of Hannover be ordered to pay to the Plaintiff a smaller amount than primarily claimed at the discretion of the court.

**Particulars of Claims:**

The Plaintiff's coverable loss after deductibles amounts to a total of **USD 1,257,757.00**. Please see item 8 below for further details. The amount is allocated among the Defendants on the basis of the relevant percentages of coverage set out in Cover Note No. 2006082 dated 16 May 2006 and Endorsement to Cover Note no. 2006082 /2006 dated 26 September 2007, submitted as **Exhibit 1.** For details of the percentages of coverage, see item 2.2.

The claimed amounts are in USD as the insurance policy mentions USD as the current currency for payment and because most of the invoices are issued in USD. Invoices issued in other currencies than USD have been translated into USD at the rates of exchange ruling at the date of payment (for the invoices for which the Plaintiff has received payment) and at the due date (for invoices which have not yet been paid), respectively. However, the Plaintiff reserves the right to claim payment of unpaid invoices at the rate of exchange in force at the date of payment as the Plaintiff did not have financial means to pay the invoices at the due date. Please see S. 5-3 of the NSPL.

See details about the claim for interest in item 9. The Plaintiff will submit an interest statement later during the final hearing.

**STATEMENT OF CLAIM:**

**1        Introduction**

1.1        This case deals with whether the Defendants are obliged to cover the Plaintiff's loss arising out of engine breakdown onboard the Plaintiff's vessel, the MS Kyodo Yarrow, which is insured by the Defendants.

1.2        The Plaintiff bought the MS Kyodo Yarrow, a liquid gas tanker driven by a MAK 8 M 551 AK engine for delivery on or around 24 August

GORRISSEN FEDERSPIEL KIERKEGAARD

2007. EMS Ship Management (UK) was technical manager of the vessel until mid May 2008 when Univan Shipmanagement became technical manager.

1.3    The First Defendant which is the leading underwriter and claims lead has refused to cover the Plaintiff's loss arising out of the engine breakdown with reference to an exemption in the insurance agreement relating to contaminated lube oil.

1.4    The Plaintiff contests that the exemption relied upon by the First Defendant applies and claims that the Defendants are liable to provide full cover under the insurance agreement.

**2    Hull Insurance**

2.1    The Plaintiff has taken out hull insurance on all risk terms with the Defendants (Exhibit 1).

2.2    The First Defendant is the leading underwriter and claims lead and under the insurance agreement it will provide 30 per cent cover. The other Defendants are co-insurers: under the insurance agreement Groupama Transport SA will provide 20 per cent cover, Assicurazioni Generali-UK will provide 15 per cent cover, Assicuranzioni Generali Spa.-UK will provide 10 per cent cover, Rembrandt Insurance Company will provide 5 per cent cover, International Insurance Comp. of Hanover will provide 20 per cent cover.

2.3    The Cover Note (Exhibit 1) states that the insurance is subject to the Norwegian Marine Insurance Plan of 1996 ("Norske Søforsikringsplan af 1996") (version 2003) (hereinafter "the NSPL"), submitted as **Exhibit 2**.

2.4    As there is no agreement as to the perils at risk the insurance will cover marine perils, cf. the NSPL S. 2-10: *"Unless otherwise agreed, the insurance covers only marine perils.".*

S. 2-8 of the NSPL further states:

> *"An insurance against marine perils covers all perils to which the interest may be exposed, with the exception of:*

GORRISSEN FEDERSPIEL KIERKEGAARD

(a)    the perils covered by an insurance against war perils in accordance with S. 2-9,

(b)    intervention by a State power. A State power is understood to mean individuals or organisations exercising public or supranational authority. Measures taken by a State power for the purpose of averting or limiting damage shall not be regarded as an intervention, provided that the risk of such damage is caused by a peril covered by the insurance against marine perils,

(c)    Insolvency,

(d)    perils covered by the RACE II clause..."

2.5    The insurer has the burden of proof that an accident covered by the insurance's perils at risk, is exempted from cover. This appears from S. 2-12, 2nd sentence of the NSPL:

"The insurer has the burden of proving that the loss has been caused by a peril that is not covered by the insurance, unless other provisions of the Plan provide to the contrary.´

2.6    As it appears below the Defendants have not discharged the burden of proof that the accident is subject to an exemption from cover.

**3    Governing Law and Venue**

3.1    The NSPL S. 1-4, 2nd sentence states the following about governing law and venue:

"If an insurance contract based on this Plan is concluded with a foreign leading underwriter, it is agreed that Norwegian law shall apply, and that the co-insurers may be sued in the venue of the leading underwriter."

3.2    Thereby, the insurance agreement will be subject to Norwegian law whereas all of the Defendants will be subject to Danish venue as the venue of the First Defendant is in Denmark.

**4        Accidents covered by the Insurance**

4.1      On 3 October 2007 at 5:37 p.m. the MS Kyodo Yarrow suffered a breakdown of its engine while carrying cargo between Lake Charles, USA and Altamira, Mexico. As **Exhibit 3** is submitted Kyodo Yarrow Statement of Facts Port Authorities, which is the master's description of the accident and facts regarding the breakdown. The breakdown was noted when the fire alarm in the engine room sounded. The crew immediately acted according to the emergency plan and found smoke when inspecting the engine room. It turned out that cylinder no. 7 of the engine had broken down.

4.2      The crew tried to repair the damage with a temporary repair of both cylinder no. 7 and adjoining bearings. After the repair work the crew tried to restart the engine on 6 October 2008. However, in vain and the engine stopped just a few minutes later. On 8 October 2007 the Kyodo Yarrow was tied to the tug boat, the El Jaguar, which towed the MS Kyodo Yarrow to Altamira with arrival on 10 October 2007.

4.3      From 12 October to 13 October 2007 the MS Kyodo loaded its cargo in Altamira.

4.4      On 16 October 2007 the MS Kyodo Yarrow was tied to the tug boat, the Elisabeth II, to be towed for repair work in Corpus Christi with arrival on 18 October 2007.

4.5      Motor-Services Hugo Stamp. Inc. ("Hugo Stamp") was hired to repair the engine which took place from 1 November 2007 to 2 January 2008 in Corpus Christi. As **Exhibit 4** is submitted Hugo Stamp's Service Report describing the extent of the repair work.

**5        Survey Reports – Reason for Breakdown**

5.1      Introduction

The vessel has been inspected several times. The first inspection took place from 10 – 12 October 2007 after arrival in Altamira. The inspection was attended by Paul Ridley (EMS Ship Management Ltd.), Michael Skipper (the First Defendant), William Watt (Mora Marine Services S.A.), Michael Miranda (Goltens) and Rafael Anzures (DNV Mexico Class Surveyor).

- 8 -

GORRISSEN FEDERSPIEL KIERKEGAARD

At arrival at Corpus Christi another inspection of the vessel took place and demounting of the main engine commenced. On 19 October 2007 another inspection took place attended by Paul Ridley and John Smallman (EMS Ship Management Ltd.), Keith Reay (3D Marine for North of England P&I), Will Bridges and Dan Creek of JD Moore Surveyors, (surveyors of the subcharterers), Chuck Anderson (marine consultant of EMS Ship Management) and J.F. Philips (IMC for Bluewater Insurance ASA.)

Finally, there was an inspection on 17 December 2007 attended by Keith Reay, Will Brigdes and Dan Creek, Chuck Anderson and J.F. Philips.

The said inspections resulted in the drafting of quite a number of survey reports:

- Reports dated 12 October 2007 and 3 January 2008, respectively by Chris Spencer on behalf of EMS Ship Management, submitted as **Exhibits 5 and 6**, respectively.

- Report dated 13 February 2008 from Independent Maritime Consulting Ltd. by J.F. Philips on behalf of the Loss of Hire insurance company, Bluewater Insurance, submitted as **Exhibit 7**.

- Undated report by L. Keith Reay for 3D Marine, submitted as **Exhibit 8** and e-mail from the same dated 29 April 2008, submitted as **Exhibit 9**.

The overall conclusion of all of the survey reports is that the engine breakdown was caused by lacking / reduced lube oil supply to cylinder no. 7 and adjoining bearings. The reason why cylinder no. 7 and adjoining bearings lacked oil was a 45 degree turn of the internal parts of the cylinder preventing supply of oil. It is unclear what caused such turn of the inner parts of the cylinder. The breakdown was <u>not</u> caused by contaminated lube oil as indicated by the First Defendants.

5.2    Reports of 12 October 2007 and 3 January 2008, respectively, by Chris Spencer (Exhibits 5 and 6).

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

Chris Spencer believes that the most probable reason for the accident was that the crank shaft was bent not that the lube oil was contaminated (Exhibit 6 page 7 under the heading "Conclusion"):

> "1.    The damage evidence as laid out above in the Managers view indicates that the most likely cause of the crank shaft damage was due to the "slightly" bent crank shaft.
>
> 2.    Taking all of the above relevant evidence into account, including the conclusive set of consistent good lub oil analysis results taken immediately before the incident it is clear that poor lub oil was not the cause of the main engine crank shaft damage".

5.3    Report of 13 February 2008 from Independent Maritime Consulting Ltd. by J.F. Philips (Exhibit 7)

J.F. Philips also denies that contaminated lube oil caused the engine breakdown (page 13 under the heading "Surveyor´s Comments"):

> "We are of the opinion that no evidence has been presented to suggest that the incident was solely the consequence of a loss of lube oil pressure or the lack of timely and proper maintenance. It was presented early on that the cause could be attributed to insolubles in the engine lube oil. With this we disagree, since there is no basis from our investigation to substantiate this conclusion....
>
> The No. 7 main bearing failed, in our opinion, due to failure of the boundary lubrication between the two adjacent running surfaces. Further the failure of the boundary lubrication was exacerbated by the .23 mm (.00905") bend in the crank shaft No.9 main bearing causing misalignment which over time led to the failure".

5.4    Undated report by L. Keith Reay (Exhibit 8) and e-mail from the same dated 29 April 2008 (Exhibit 9)

In accordance with the above reports L. Keith denies that contaminated oil could have caused the engine breakdown (Exhibit 9 at the middle says the following):

> "We are in general agreement with LOH surveyor findings as stated in his "Surveyors Comments". We also are of the opinion that luboil condition and general maintenance was not the cause of the incident, but that the incident was directly related to the crankshaft having been bent at some prior time".

**5.5    Summary**

The conclusion of all of the said reports is that the breakdown was not caused by contaminated lube oil.

**6       Notification to TrygVestas**

6.1    The Plaintiff notified the First Defendant about the breakdown immediately after 3 October 2007 and in a letter of 15 October 2007, **Exhibit 10**, requested payment on account. The First Defendant refused the request in a letter of 26 October 2007, **Exhibit 11**. The First Defendant also rejected to pay an amount on account in a letter of 20 February 2008, **Exhibit 12**. The following appears from the first page, 4th paragraph of the e-mail:

> "Approving a Payment of Account is usually a matter of expedition, but given that we have serious doubts as to the cover we have so far denied to such an approval "

6.2    At later discussions with the First Defendant it appeared that the rejection was based on the exemption of cover set out in the NSPL S. 12-5 (f). The NSPL S. 12-5 (f) reads:

> "The insurer is not liable for..
>
> (f) loss due to lubricating oil, cooling water or feed water becoming contaminated, unless proper measures were taken as soon as possible after the insured, the master or the chief engineer became, or must be deemed to have become, aware of the contamination, and in any event not later than three months after one of them should have become aware or the contamination".

- 11 -

GORRISSEN FEDERSPIEL KIERKEGAARD

**7        Exemption to Cover in the NSPL S. 12-5 (f)**

7.1      Introduction

In order for the exemption in the NSPL S. 12-5 (f) to apply and for the Defendants to be released from their obligation to cover the damage the Defendants must prove that, (1) the lube oil in the main engine was contaminated, and that (2) the contaminated lube oil actually caused the breakdown. Even if the Defendants can prove this the Defendants will, however, still be obliged to cover the damage if suitable measures were taken as soon as possible and no later than 3 months after the master or the chief engineer of the vessel became aware of or ought to have become aware of the contamination.

In order to establish whether the breakdown was caused by contaminated lube oil it will first be necessary to look into the concept of "contaminated lube oil".

7.2      The lube oil was not contaminated.

7.2.1    What is contaminated lube oil for the purpose of the NSPL S. 12-5 (f)?

The draftsmen of the NSPL have made commentaries for the NSPL. The commentaries are very helpful in the event of interpretation doubt as to the provisions of the NSPL. The commentary for S. 12-5 (f), submitted as **Exhibit 13,** states:

> "As explicitly mentioned in the provisions contamination of lube oil also includes reduced quality over time due to waste products, sediments, etc...."

In connection with combustion in an engine particles of soot will always occur. They can be seen as a waste product. Therefore, not any occurrence of particles of soot will cause contamination of lube oil as particles of soot will always be present to a certain extent. Furthermore, one of the functions of the lube oil is to carry particles of soot away from the engine and therefore, the presence of such cannot be avoided.

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

Thereby there is a flowing transition between the acceptable and un-
avoidable amount of particles of soot and the unacceptable amount
of particles of soot which will be deemed contamination according to
the NSPL S. 12-5 (f).

The question is at which point the limit for an acceptable amount of
particles of soot is exceeded.

The quality recommendations from the engine manufacturer and the
oil producer are both very relevant sources when determining the
degree of oil contamination.

7.2.2    Recommendations from the Oil Producer and the Engine Manufac-
turer

7.2.2.1  FAMM has analysed samples of the lube oil both before (in May, Au-
gust and September 2007) and after the breakdown. As **Exhibit 14**
is submitted Condition Monitoring Reports from FAMM, dated 31
January 2008, 1 February 2008 and 7 February 2008, respectively.
All test results have shown that the oil was suitable for further ser-
vice.

The oil sample reports dated 31 January and 7 February 2008, re-
spectively, state that the result of the sample taken on 12 October
2007 immediately after the breakdown was that:

> "The oil is considered suitable for further service. No action is
> required".

7.2.2.2  FAMM also made a specific particle test of the oil sample taken on 12
October 2007. Subsequently a report was made on 18 February
2008, **Exhibit 15**. The following appears from page 4 of the report
under the heading "Conclusion":

> "Routine oil analysis shows that the oil was in good condition."

According to the report (page 2 under the heading "Analysis results")
the contents of asphalt particles was 0.01 per cent and with refer-
ence to that percentage the following is concluded (page 2 at the
bottom):

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

"A negligible amount of asphaltene was present".

7.2.2.3   According to Chris Spencer's letter of 11 February 2008, submitted as **Exhibit 16**, the content of asphalt particles is not critical until it reaches a level of 0.5 per cent. The engine manufacturer recommends a particle content below 1 per cent and the maximum value is 2 per cent. This appears from page 6 of the engine manufacturers manual "Operating Media", **Exhibit 17,** and from Chris Spencer's report of 3 January 2008 (Exhibit 6, page 4, section 5). Thereby the contents of asphalt particles in FAMM's particle test of the oil sample taken on 12 October 2007 is considerably below the maximum limits recommended by the oil manufacturer and the engine manufacturer.

7.2.2.4   In accordance therewith FAMM concluded in its letter of 18 February 2008, submitted as **Exhibit 18**, the following (first page at the bottom):

> "I hereby reconfirm that the viscosity, BN and other parameters are well within acceptable limits indicating that the oil was suitable to use."

Therefore the oil was both in accordance with the recommendations of the oil producer as well as the engine manufacturer.

7.2.3   ISO 4406 oil test

7.2.3.1   On 24 October 2007 the First Defendant sent an oil sample to Saybolt Danmark A/S for a so-called ISO 4406 test. As **Exhibit 19** is submitted an ISO 4406 report dated 24 January 2008 from Saybolt Danmark. The test showed that the lube oil had the following value (ISO code): "28/25".

Measured values, stated in ISO codes, have 3 digits, e.g. "01/01/01". Apparently, the third and last measured value is missing from the value stated as "28/25". I refer to a table showing the connection between the degree of contamination and recommended use submitted as **Exhibit 20**.

G O R R I S S E N   F E D E R S P I E L   K I E R K E G A A R D

Therefore, it is not evident what the value "28/25" means.

7.2.3.2  Further, the ISO 4406 report states that the oil sample was unsealed (see Exhibit 20) and that the oil sample was diluted due to insufficient sample amount. However, it does not state which substance had been used to dilute the oil.

7.2.3.3  Furthermore, the ISO 4406 test does not apply to dark lube oil but only to light and transparent hydraulic oils. On 31 January 2008 FAMM refused to make the ISO 4406 test for the above reasons. The letter is submitted as **Exhibit 21**.

7.2.4    Frequent Replacement of Oil Filters

7.2.4.1  Over a period of time the consumption of oil filters for Kyodo Yarrow's main engine has been high. The First Defendant has pointed out to the Plaintiff that increased replacement of oil filters in the engine could indicate contamination of the lube oil to such an extent that insurance cover would lapse.

7.2.4.2  This is contested. The high consumption of oil filters was due to increased use of cylinder lube oil causing increased content of particles in the cylinder lube oil. However, FAMM's test results show, see above, that the contents of particles in the oil were minimal and within acceptable limits.

In an attempt to improve the running of the engine the Plaintiff chose to increase the use of cylinder lube oil. The increased use of cylinder lube oil meant that a small quantity of the oil came into contact with combustion gases/particles and then went back into the oil sump of the engine due to the design of the engine (Trunk engine). (Cf. also Chris Spencer's report of the 3rd January 2008, Exhibit 6, page 6).

Surplus cylinder lube oil that went directly back into the engine's sump contained combustion particles, but, only to a small extent. However, as explained in item 7.3 this is not important as the oil is filtered before getting into contact with the said cylinders.

As a natural consequence of the increased use of cylinder lube oil the sediments in the oil filters increased and thereby also the replacement frequency for the so-called "Paper Cartridge Filters".

7.3    Causal Connection

7.3.1    In order for cover to lapse under the NSPL S. 12-5 (f) there must be a causal connection between the allegedly contaminated oil and the damage occurred. The Plaintiff contests that the oil was contaminated. If nevertheless this is considered probable the Plaintiff contests that a causal connection exists between the contaminated oil and the damage occurred.

7.3.2    All of the submitted inspection reports conclude that the breakdown was not caused by contaminated oil.

7.3.3    According to the First Defendant the frequent replacement of oil filters resulted in contaminated oil in the lube oil system for the main engine.

7.3.4    This is contested. The frequent replacement of filters could not have caused sediments inside the engine. As **Exhibit 22** is submitted an illustration showing how the lube oil moves inside the engine which can briefly be explained as follows:

- lube oil goes from the sump and into Filter I (Duplex Basket Type);
- then the oil is filtered in filter II (Boll & Kirch Automatic L.O. filter, Candle Type);
- filter II is automatically cleaned in a so-called back flush;
- then lube oil and dirt from back flush is cleaned in the so-called paper cartridge filters (they are the ones often replaced);
- the dirt remain in the paper cartridge filters and they are replaced when necessary;
- the lube oil cleaned in the paper cartridge filters goes back in the sump and not into the engine.

GORRISSEN FEDERSPIEL KIERKEGAARD

As it appears from the above it is not relevant that the oil filters are frequently replaced as the oil with sediment caught by the filters is not lead back into the engine but to the contrary into the sump. It is not possible for the lube oil to get back into the engine before it has been back in the sump and through the above oil filters as the opposing oil pressure will prevent this.

7.3.5    The breakdown not being caused by contaminated lube oil but instead by a bent crankshaft is among others supported by the fact that the cylinders in the "bent" end of the shaft (around cylinders 6-9) were more worn than the ones at the other end. That was also concluded by Chris Spencer in his report of 3 January 2008 (Exhibit 6). Under the heading "Oil Contamination" the report (page 3) states;

> "If the 'lub oil' was contaminated to such an extent that it was the main cause of the failure then it would have been reasonable to assume that all the bearings in the engine would have been damaged in a uniform manner. This was in fact not the case. No´s 1,2,3,4,5,6 main bearing shells, crankpin bearing shells and crankshaft bearings show a normal running pattern. The fact that the damage on these bearings- running from aft to forward-furthest away from the bent crankshaft reasonably indicate that the damage was not caused solely by lub oil."

7.4      Suitable Measures and Knowledge of Contamination

7.4.1    Loss of cover under the NSPL S. 12-5 (f) further requires that suitable measures were not taken as soon as possible and no later than 3 months after the insured (the Plaintiff) the master or the chief engineer became aware of or must be deemed to have become aware of the contamination.

7.4.2    The Plaintiff contests that it or anyone for whom the Plaintiff is responsible was or ought to have been aware of the contamination of the lube oil before the damage occurred. The Plaintiff has on a current basis and in accordance with ordinary good practice tested the oil. All of the tests have shown that the oil could be used and that

GORRISSEN FEDERSPIEL KIERKEGAARD

further tests were not necessary. There was nothing indicating that the Plaintiff or anyone for whom the Plaintiff was liable should have been aware that the oil could be contaminated.

**8      The Plaintiff's Loss**

Pursuant to the NSPL S. 2-11, 1st sentence the Defendants are liable to compensate the Plaintiff for its loss if during the term of the insurance the vessel is exposed to any peril covered under the insurance.

The Defendant's liability to pay damages arises, cf. the NSPL, S. 12-1, 2nd sentence, when the repair costs have incurred. It is not relevant in connection with the Defendants' liability to pay damages that due to the lacking payment on account by the Defendant the Plaintiff has not yet paid all outstanding balances for repair work etc.

The Plaintiff's covered loss is **USD 1,257,757.00**. See **Exhibit 23** for further details.

Below please find particulars for each of the cost entries.

Invoices issued in other currencies than USD have been converted into USD at the rate of exchange ruling on the date of payment (for invoices paid by the Plaintiff) and at the due date (for invoices not yet paid), respectively. However, the Plaintiff reserves the right to request that unpaid invoices be paid at the rate of exchange ruling at the date of payment as the Plaintiff has not had the financial means to pay the invoices when due. Please see S. 5-3 of the NSPL.

8.1     Costs for Tug Boats

As described above the "El Jaguar" towed  the "Kyodo Yarrow" from the place of the accident to Altamira where the towage arrived on 10 October 2007.

Subsequently the "Kyodo Yarrow" was towed by the "Elisabeth II" from Altamira to Corpus Christi from 16 October to 18 October 2007. Total costs amounted to USD 121,021.10.

GORRISSEN FEDERSPIEL KIERKEGAARD

Below follows costs for tug boat:

| Invoice | Re | Date of payment | EUR | GBP | USD |
|---|---|---|---|---|---|
| 2007710-071 | Elisabeth II | 20.10.2007 | | | 52,500.00 |
| 2007710-071 | Elisabeth II | 09.01.2008 | | | 68,551.10 |
| | | Total USD paid | | | 121,051.10 |

The above invoices are submitted as **Exhibit 24**.

8.2    Costs for Agents

In connection with arrival at and stay in Altamira and Corpus Christi the Plaintiff received assistance from the agents Biehl & Co., L.P., Texas Dock & Rail Company, Ltd., Agencia Consignataria Del Golfo (GOLMAR) and Golten Service Co.

Below follows costs for agents:

| Invoice | Date of payment | Re | EUR | GBP | USD |
|---|---|---|---|---|---|
| 756540 | 09.01.2008 (USD 93,463.30 balance USD - 27,685.75) | Biehl | | | 121,151.05 |
| 2569 | 02.11.2007 | Texas Dock & Rail | | | 12,862.50 |
| 2582 | 21.11.2007 | Texas Dock & Rail | | | 14,349.70 |
| 2590 | 03.12.2007 | Texas Dock & Rail | | | 15,068.40 |
| 2598 | 17.12.2007 | Texas Dock & Rail | | | 14,651.80 |
| 2609 | 10.01.2008 | Texas Dock & Rail | | | 14,824.50 |
| 2617 | 16.01.2008 | Texas Dock & Rail | | | 6,336.60 |
| 2293-A | 26.10.2007 (USD 79,097.71 balance USD - 8,575) | GOLMAR | | | 87,672.71 |
| 26955 | Unpaid | Golten Service Co. | | | 9,245.00 |
| A-2299 | Unpaid | GOLMAR | | | 6,632.29 |
| | | Total USD paid | | | 250,879.91 |
| | | Outstanding balance not yet paid | | | 51,915.59 |

The above invoices are submitted as **Exhibits 25.1-25.10**.

8.3    Repair Costs

The Plaintiff had the "Kyodo Yarrow" repaired in Corpus Christi by various suppliers.

- 19 -

Below follows repair costs in Corpus Christi:

| Invoice | Date of payment | Re | EUR | GBP | USD |
|---|---|---|---|---|---|
| 20175-AP | 03.12.2007 | Texas Service Industry | | | 4,774.60 |
| 8574-AP | 18.07.2008 | Texas Service Industry | | | 21,841.71 |
| KYAR5003F07 | 17.10.2007 | R. Toes | 98,000.00 | | 138,953.22 |
| 20079938 | Unpaid | Machinefabriek Bolier | 6,322.00 | | 9,293.34 |
| 20079560 | Unpaid | Machinefabriek Bolier | 6,060.20 | | 8,912.26 |
| 20079559 | Unpaid | Machinefabriek Bolier | 29,564.70 | | 43,489.67 |
| 20079558 | Unpaid | Machinefabriek Bolier | 1,669.70 | | 2,456.13 |
| 20079645 | Unpaid | Machinefabriek Bolier | 2,912.20 | | 4,278.02 |
| 20079936 | Unpaid | Machinefabriek Bolier | 189.00 | | 277.89 |
| 20079962 | Unpaid | Machinefabriek Bolier | 5,111.80 | | 7,519.45 |
| 20079611 | Unpaid | Machinefabriek Bolier | 1,166.50 | | 1,722.80 |
| 20079554 | Unpaid | Machinefabriek Bolier | 3,227.00 | | 4,749.12 |
| 20079555 | Unpaid | Machinefabriek Bolier | 10,820.00 | | 15,916.22 |
| 20079557 | Unpaid | Machinefabriek Bolier | 2,929.00 | | 4,308.55 |
| 20079561 | Unpaid | Machinefabriek Bolier | 927.00 | | 1,363.17 |
| INV076440 | 07.01.2008 | Mares Shipping | 68.40 | | 101.08 |
| 200850066 | Unpaid | Machinefabriek Bolier | 154.00 | | 222.99 |
| 164542 | 25.01.2008 | Motor-Service Hugo Stamp | | | 52,786.42 |
| 164486 | 25.01.2008 | Motor-Service Hugo Stamp | | | 7,804.78 |
| 164775 | 02.11..2007 (USD 50,000)<br><br>25.01.2008 (USD 140,000)<br><br>25.01.2008 (USD 34,200)<br><br>Balance USD - 212,592.85 | Motor-Service Hugo Stamp | | | 436,792.85 |
| INVO706237 | 07.01.2008 | | 1,790.50 | | 2,642.75 |
| INVO706068 | 07.11.2007 | | 224.50 | | 324.33 |
| 07.1/1.249-3 | Unpaid | | | | 330.39 |
| 07.1/1.249-2 | Unpaid | | | | 705.20 |
| 07.1/.628-D | Unpaid | | | | 874.10 |
| INVO706367 | 07.01.2008 | | 3,279.57 | | 4,840.95 |
| Total USD paid | | | | | 458,269.84 |
| Outstanding balance not yet paid (USD) | | | | | 317,648.98 |

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

The above invoices are submitted as **Exhibits 26.1-26.26**.

8.4     Class Costs

During and after repair in Corpus Christi costs for the class company, Det Norske Veritas Mexico, were incurred for inspection etc. of the vessel.

Below follows class costs:

| Invoice | Re | Date of payment | EUR | GBP | USD |
|---------|-----|-----------------|-----|-----|-----|
| Id 12861 | DNV | 16.11.2007 | | | 3,791.00 |
| MNSUS 523 882148 | DVN | Unpaid | | | 31,461.42 |
| Total USD paid | | | | | 3,791.00 |
| Outstanding balance not yet paid | | | | | 31,461.42 |

The above invoices are submitted as **Exhibits 27.1 and 27.2**.

8.5     Costs for Forwarding Agent

During the repair period the Plaintiff needed to have spare parts carried, including a new crankshaft from Rotterdam to Corpus Christi. Carriage was handled by Mainport Forwarding B.V.

Costs for forwarding agent are the following:

| Invoice | Re | Date of payment | EUR | GBP | USD |
|---------|-----|-----------------|-----|-----|-----|
| 12004/710774 | Mainport | 31.07.2008 | 35,873.39 | | 52,951.75 |
| Total USD paid | | | | | 52,951.75 |

The above invoice is submitted as **Exhibit 28**.

8.6     Inspection costs

During inspections of the "Kyodo Yarrow" various costs were incurred for wages and transportation, etc. to John Smallman and Paul Ridley.

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

Below follows inspection costs:

| Invoice | Date of payment | Re | EUR | GBP | USD |
|---|---|---|---|---|---|
| 604696221 | 29.01.2008 | HRG UK | | 46.00 | 91.34 |
| 604689228 | 29.01.2008 | HRG UK | | 3,272.90 | 6,498.99 |
| 60468869 | 29.01.2008 | HRG UK | | 46.00 | 91.34 |
| 604690872 | 29.01.2008 | HRG UK | | 46.00 | 91.34 |
| 604665316 | 29.01.2008 | HRG UK | | 46.00 | 91.34 |
| 604660979 | 29.01.2008 | HRG UK | | 46.00 | 91.34 |
| 604652163 | 29.01.2008 | HRG UK | | 46.00 | 91.34 |
| 604659703 | 29.01.2008 | HRG UK | | 46.00 | 91.34 |
| 604524100 | 29.01.2008 | HRG UK | | 46.00 | 91.34 |
| 604524215 | 29.01.2008 | HRG UK | | 4,198.00 | 8,335.96 |
| 67674697 | 29.01.2008 | HRG UK | | 5,063.00 | 10,053.59 |
| 604302888 | 29.01.2008 | HRG UK | | 3,717.20 | 7,380.84 |
| 604302863 | 29.01.2008 | HRG UK | | 173.60 | 343.52 |
| 604291363 | 29.01.2008 | HRG UK | | 2,403.00 | 4,771.63 |
| | 29.01.2008 | EMS UK | | 154.92 | 305.79 |
| | 29.01.2008 | EMS UK | | 352.97 | 698.96 |
| | 29.01.2008 | EMS UK | | 365.58 | 724.78 |
| | 29.01.2008 | EMS UK | | 2,690.05 | 5,341.53 |
| | 29.01.2008 | EMS UK | | 3,782.15 | 7,510.20 |
| | 29.01.2008 | EMS UK | | 574.28 | 1,140.34 |
| | | Total USD paid | | | 53,757.43 |

The above invoices are submitted as **Exhibits 29.1-29.20**.

8.7   Communication Costs

During the course of the accident the Defendant has paid costs of communication

Below follows communication costs:

| Invoice | Re | Date of payment | EUR | GBP | USD |
|---|---|---|---|---|---|
| | Office communication, estimate | | | 300.00 | 590.61 |
| 5023600 | Vodafone | | | 780.27 | 1,604.78 |
| 5099669 | Vodafone | | | 1,097.05 | 2,176.83 |
| 5167565 | Vodafone | | | 1,813.80 | 3,570.82 |
| 5048808 | Vodafone | | | 69.75 | 142.15 |
| | Total USD paid | | | | 5,908.36 |

The above invoices are submitted as **Exhibits 30.1-30.4**.

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

8.8      Use of Lube Oil

In December 2007 Chevron changed oil on the "Kyodo Yarrow" and at the same time an additional 9000 litres of oil was added.

Below follows costs for change of lube oil:

| Invoice | Re | Date of payment | EUR | GBP | USD |
|---------|-----|-----------------|-----|-----|-----|
| 361766 | Chevron | Unpaid | | | 22,622.40 |
| Outstanding balance not yet paid (USD) | | | | | 22,622.40 |

The above invoice is submitted as **Exhibit 31.**

**9        Interest**

9.1      Interest on disbursements

Pursuant to the NSPL S. 5-4, 1st sentence, the Plaintiff's claim for cover of disbursements carries interest from the date of the disbursements.

The NSPL S. 5-4, 1st sentence reads:

> *"The insured may claim interest as from one month after the date on which notice of the casualty was sent to the insurer. If the insurer has to refund the insured's disbursements, interest accrues from the date of the disbursement. If the insurer is to indemnify the insured for loss of time, interest does not accrue until one month after expiry of the period for which the insurer is liable.*

According to Wilhelmsen Bull "Handbook in Hull Insurance" 2007, p. 318, the date of the disbursement is the day when the claim was incurred, i.e. the date on which the insured entered into the relevant agreements. For the sake of clarity the Plaintiff does not wish to use (the early) date but the date of payment for paid invoices and the due date for invoices not yet paid.

Pursuant to the NSPL S. 5-4, 3rd sentence, the rate of interest for ordinary interest pursuant to the NSPL S. 5-4, 1st sentence is six

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

months LIBOR + 2 per cent at 1 January 2007 calculated on the basis of the average interest rate for November and December 2006.

The NSPL S. 5-4, 3rd sentence reads:

> *The rate of interest is six month NIBOR + 2 per cent for insurance contracts in which the sum insured is stated in Norwegian Kroner and otherwise six month LIBOR + 2 per cent. Interest is determined as at January 1 of the year the insurance contract comes into effect at the average rate for the last two months of the preceding year.*

Pursuant to S. 5-4, 3rd sentence the relevant interest rate is <u>7.4881</u> per cent.

9.2    Default Interest

In addition to the ordinary interest on disbursements pursuant to the NSPL S. 5-4, 1st sentence default interest also accrues, cf. the NSPL S. 5-4, 4th sentence, on both paid and unpaid invoices.

The NSPL, S. 5-4, 4th sentence reads:

> *"After the due date, cf. S. 5-6, interest on overdue payments accrues according to the provisions of the Act relating to Interest on Overdue Payments of 17 December 1976, S. 3, sub-paragraph 1, if the interest on overdue payments is higher than the interest determined according to the above rules".*

The Act on interest for late payment etc. of 17 December 1976 S. 3, 1st sentence reads:

> *"Each six months the department will set the default interest at a fixed annual percentage which must equal the monetary lending rate set by Norges Bank at 1st January and 1st July for the year in question plus minimum 7 per cent."*

At present the default interest rate is <u>12.75</u> per cent and will incur, as described above, from the due date.

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

Pursuant to the NSPL S. 5-2 the claims adjustment must be issued "as promptly as possible". The NSPL 1996 version 2003 does not clearly explain what is meant by "as promptly as possible". However the commentary for the NSPL 1996 version 2003, S. 5-2 (Exhibit 13) states the following (emphasis added by me):

> "The first sentence, regarding that the insurer shall issue the claims adjustment as promptly as possible, is identical to the 1964 Plan. However, the 2nd sentence of the 1964 Plan contained more detailed time-limits: In the event of a settlement under the rules relating to a total loss, the claims adjustment was to be issued at the latest within 14 days, and in other cases at the latest within 3 months after the insurer had received the necessary particulars and documents.... The insurers should ...... endeavour to meet a deadline of 14 days for total losses and 3 months for other settlements".

The decisive point in relation to setting the due date is the time when the Defendant received particulars and documents necessary for the claims adjustment.

It seems that on 15 February 2008 the First Defendant had received all necessary particulars and documents. This is supported by the contents of the First Defendant's letter of 20 February 2008 (Exhibit 12) which reads:

> "During the first survey of the vessel, while under repair in Corpus Christi it was agreed that an oil analysis incl. particle counting would be required – Only on the 15.2 did we in fact receive the result of said test. As I am sure you will agree it is only fair that our surveyors is given time to process the documentation delivered, and given that this case in not the only one on his desk that is not something done over- night."

The claims adjustment should, see the commentary for the NSPL S. 5-2, have been issued no later than 3 months after 15 February 2008, i.e. 15 May 2008.

823009-1 PA MR 02.12.2008

GORRISSEN FEDERSPIEL KIERKEGAARD

As pursuant to the NSPL the due date is six weeks after the time when the claims adjustment should have been issued the due date must have been 26 June 2008 (six weeks after 15 May 2008).

Pursuant to the NSPL S. 5-4, 4th sentence the Plaintiff's claim will carry default interest from 26 June 2008 at a rate of 12.75 per cent.

9.3     Summary

Settled disbursements will carry interest, see above, at two different percentages. From payment of the disbursement / invoice due date and until 26 June 2008 the disbursements will carry interest, cf. the NSPL S. 5-4, 1st and 3rd sentences, at a rate of 7.4881 per cent and from 26 June 2008 until the Defendant's compensate the disbursements they will carry interest at the default interest rate of 12.75 per cent, cf. the NSPL S. 5-4, 4th sentence.

However, unpaid invoices will only carry interest at the default interest rate from 26 June 2008, cf. the NSPL S. 5-4, 4th sentence.

**ALLEGATIONS:**

The Plaintiff submits:

that     the damage occurred at the breakdown on 3 October 2007 is an incident covered by the Plaintiff's insurance, cf. the Norwegian Marine Insurance Plan S. 2-8;

that     therefore, the Defendants must provide cover under the insurance, cf. the Norwegian Marine Insurance Plan S. 2-11, 1st sentence unless the Defendants can prove that the breakdown is subject to the exemptions from coverage under the insurance;

that     the Defendants have not proved that the breakdown is covered by any exemptions from coverage from the insurance;

that     it has not been proved that the breakdown was caused by contaminated oil;

as     the oil test carried out by FAMM immediately after the breakdown showed that the oil was suitable for further use and ob-

- 26 -

served the recommendations of both the oil manufacturer as well as of the engine manufacturer in relation to contents of particles;

as    the ISO 4406 oil test by Saybolt Danmark A/S (Exhibit 19) cannot be used as proof of contamination of the lube oil as (i) the test is not applicable to the said type of lube oil, (ii) the oil sample was not appropriately sealed, (iii) the oil sample had been diluted and (iv) it is not evident what the value "28/25" means; and

as    all of the inspection reports referred to conclude that the breakdown was not caused by contaminated oil;

that    should the court find that it has been proven that the breakdown was caused by contaminated oil it must be taken into account that neither the Plaintiff, the master, nor the chief engineer were or ought to have been aware of the contamination;

as    on a current basis and in accordance with ordinary good practice the Plaintiff has tested the oil; and

as    the tests have shown that the oil was suited for continued use and further tests would not be necessary (see Exhibit 4); and

that    should the court find that it has been proven that the Plaintiff or anyone for whom it is responsible was or ought to have been aware of the contamination, the Plaintiff has taken suitable measures to prevent contamination.

**WITNESSES:**

The Plaintiff intends to summon the following to give evidence at the hearing:

- Theodor Maurstad, Maurstad Marineconsult

The right to make further claims and to amend the claims made and submit further allegations and evidence of any nature is reserved.

- 27 -

GORRISSEN FEDERSPIEL KIERKEGAARD

**PREPARATION OF THE CASE:**

In accordance with the Administration of Justice Act S. 353 we have the following remarks:

| | |
|---|---|
| Re. (1) nos. 2: | I expect that the Defendant's Defence is to be replied. |
| Re. (1) nos. 3: | This depends on the Defendant's Defence. |
| Re. (1) nos.4: | The time table cannot be determined, cf. above. |
| Re. (1) nos. 17: | An estimate over the costs cannot be made before the Defendant's Defence is submitted. |
| Re. (1) nos. 18: | The preparation of the Hearing as to the time table can only be fixed once the need of evidence of both sides is clear. |
| Re. (1) nos.19: | For the time being the case is not suitable for a settlement. |

The remaining items in the Administration of Justice Act S. 353 are commented in this Writ or do not cause me to comments for the time being.

**PROCEDURAL NOTICE:**

Procedural notices etc. to the Plaintiff may be addressed to the undersigned, attorney Peter Appel, H.C. Andersens Boulevard 12, 1553 Copenhagen V.

The Plaintiff is not registered for VAT.

Copenhagen, 28 November 2008

Peter Appel

823009-1 PA MR 02.12.2008

## GORRISSEN FEDERSPIEL KIERKEGAARD

**Exhibits:**

| | |
|---|---|
| Exhibit 1: | Endorsement to Cover Note No. 2006082 dated 16 May 2006 |
| Exhibit 2: | The Norwegian Marine Insurance Plan of 1996 (2003 version) |
| Exhibit 3: | Kyodo Yarrow Statement of Facts |
| Exhibit 4: | Service Report dated 1 April 2008 from Motor-Services Hugo Stamp. Inc. |
| Exhibit 5: | Report by Chris Spencer dated 12 October 2007 |
| Exhibit 6: | Report by Chris Spencer dated 3 January 2008 |
| Exhibit 7: | Report by J.F. Phillips, Independent Maritime Consulting, Ltd, dated 13 February 2008 |
| Exhibit 8: | Report by L. Keith Reay, 3D Marine, undated |
| Exhibit 9: | E-mail of 29 April 2008 from L. Keith Reay to David Walker |
| Exhibit 10: | E-mail of 15 October 2007 from Rolf Berentzen to Henrik Pilegaard, Tryg |
| Exhibit 11: | E-mail of 26 October 2008 from Dorte Thau, Tryg, to Rolf Berentzen |
| Exhibit 12: | E-mail of 20 February 2008 from Dorte Thau, Tryg, to Wikborg, Rein & Co |
| Exhibit 13: | Excerpt of NSPL commentaries |
| Exhibit 14: | Oil test reports (Condition Monitoring Report) from FAMM |
| Exhibit 15: | Oil test report of 18 February 2008 |
| Exhibit 16: | E-mail of 11 February 2008 from Chris Spencer to Rolf Berentzen |
| Exhibit 17: | Operating media |
| Exhibit 18: | E-mail of 18 February 2008 from FAMM to Chris Spencer |
| Exhibit 19: | ISO 4406 report of 24 February 2008 |
| Exhibit 20: | ISO test table |
| Exhibit 21: | E-mail from FAMM to Chris Spencer |
| Exhibit 22: | Kyodo Yarrow Schematic of M.E. Lub Oil System |
| Exhibit 23: | Statement of loss |
| Exhibit 24: | Costs for tug boat |
| Exhibits 25.1-25.10: | Costs for agents |
| Exhibits 26.1-26.26: | Repair costs |
| Exhibits 27.1-27.2: | Class costs |
| Exhibit 28: | Costs for forwarding agent |
| Exhibits 29.1-29.20: | Inspection costs |
| Exhibits 30.1-30.4: | Communication costs |
| Exhibit 31: | Lube oil costs |

823009-1 PA MR 02.12.2008