UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KYODO SHIPPING, LTD.,

        Plaintiff,

 -against-

GROUPAMA TRANSPORT S.A.,
ASSICURANZIONI GENERALI - UK,
ASSICURANZIONI GENERALI SPA - UK,
REMBRANDT INSURANCE COMPANY,
INTERNATIONAL INSURANCE COMPANY
OF HANNOVER LTD., and TRYGVESTA
FORSIKRING A/S,

        Defendants.

09 Civ.

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION TO VACATE THE ATTACHMENT</u>**

Of Counsel:

Kirk M. Lyons
Jon Werner

**Lyons & Flood, LLP**

Attorneys for Plaintiff
KYODO SHIPPING, LTD.

65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

# TABLE OF CONTENTS

|  |  | Page(s) |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| STATEMENT OF FACTS | | 1 |
| ARGUMENT | | 5 |
| POINT I | PLAINTIFF HAS MET ITS RULE E(4)(F) BURDEN UNDER AQUA STOLI | 5 |
| POINT II | THE COURT MUST LOOK TO NEW YORK STATE LAW TO DETERMINE WHETHER DEFENDANTS HAVE AN ATTACHABLE PROPERTY INTEREST IN THE FUNDS TRANSFERS | 7 |
| POINT III | THE FUNDS TRANSFERS UNDER RESTRAINT ARE VALIDLY ATTACHED PROPERTY UNDER NEW YORK STATE LAW | 10 |
| POINT IV | THE APPLICATION OF JALDHI TO THIS ACTION WOULD BE INEQUITABLE | 15 |
| CONCLUSION | | 16 |

## PRELIMINARY STATEMENT

Plaintiff, KYODO SHIPPING, LTD. ("KYODO"), through its attorneys, Lyons & Flood, LLP, hereby submits this memorandum of law in opposition to defendants' motion to vacate the October 9, 2009, Order Directing Clerk to Issue Process of Maritime Attachment and Garnishement and Appointing Process Server ("Attachment Order"), pursuant to Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") and Local Admiralty Rule E.1. Accompanying this memorandum of law is the Affirmation of Jon Werner dated November 23, 2009 ("Werner Aff."), and the Exhibits thereto, to which this Court is respectfully referred.

## STATEMENT OF FACTS

In or about May of 2006, the defendants issued marine insurance coverage to the M/V KYODO YARROW (the "Vessel"), a liquid gas tanker owned by plaintiff KYODO. (See Exhibit "A" to Werner Aff. at ¶¶ 2 and 9.) The policy collectively issued by the defendants (the "Policy"), provided hull and machinery coverage to the Vessel, incorporated the Norwegian Marine Insurance Plan of 1996, and was made subject to Norwegian law and Danish litigation. (See Exhibit "A" to Werner Aff. at ¶¶ 10 and 14.)

On October 3, 2007, while carrying cargo between Lake Charles, Louisiana and Altamira, Mexico, the Vessel suffered an engine breakdown due to a covered peril, and plaintiff subsequently incurred repair costs of approximately $1,257,757.00. (See Exhibit "A" to Werner Aff. at ¶ 11.) Plaintiff subsequently made a claim under the Policy, which defendants denied. (See Exhibit "A" to Werner Aff. at ¶ 12.)

On or about November 28, 2008, plaintiff commenced litigation against defendants in the Danish Maritime and Commercial Court seeking recovery of the repair costs incurred, and which

1

should properly be paid under the coverage of the Policy. (See Exhibit "A" to Werner Aff. at ¶ 15.)

Subsequently, on October 1, 2009, plaintiff commenced the instant action by filing a Verified Complaint (under seal) seeking security for its claims against the defendants which were pending in the Danish courts. On October 9, 2009, the Court issued an Attachment Order authorizing plaintiff to attach property of the defendants, including electronic funds transfers ("EFTs") passing through the District. (See Exhibit "B" to Werner Aff.)

Plaintiff commenced service of the Attachment Order on a number of garnishee banks located in the District and on October 14, 2009, and October 15, 2009, plaintiff was advised by counsel for Bank of America N.A. ("BANA") that it had restrained EFTs in the amount of 4,493 DKK (equivalent to approximately $900.00) and $1,777.50 respectively, both of which were originating from defendant TRYGVESTA FORSIKRING A/S ("Trygvesta"). (See Exhibit "C" to Werner Aff., which provides a complete accounting of the funds under attachment.)

On October 16, 2009, the Second Circuit issued its decision in <u>Shipping Corp. of India v. Jaldhi Overseas PTE Ltd.</u>, 2009 U.S. App. LEXIS 22747 (2nd Cir. Oct. 16, 2009), holding that it was reversing its prior holdings in <u>Winter Storm Shipping, Ltd. v. TPI</u>, 310 F.3d 263 (2nd Cir. 2002) and <u>Consub Del. LLC v. Schahin Engenharia Limitada</u>, 543 F.3d 104 (2nd Cir. 2008).

On October 23, 2009, counsel for defendants wrote to the Court suggesting that in light of the <u>Jaldhi</u> decision, "[p]laintiff's present action is no longer sustainable and should be dismissed." On October 27, 2009, the Court issued an Order providing that "Defendant's letter, dated October 23, 2009, will be treated as a motion to vacate to be heard at noon on Wednesday, November 4, 2009, in courtroom 18C." (See Exhibit "D" to Werner Aff.)

After the issuance of the Jaldhi decision, and despite defendants' suggestions to the contrary, plaintiff continued to serve the Attachment Order on the garnishee banks, with the understanding that the Attachment Order remained valid to the extent that it authorized the restraint of any tangible or intangible property of the defendants located in the District, as such property interests are determined according to New York state law.

Thus, prior to the November 4, 2009, conference, plaintiff had attached additional property of the defendants. In particular, on October 29, 2009, plaintiff received notice from Societe Generale New York Branch ("SGNY") that $197,571.92 in funds was restrained in an account bearing the title Groupama Transport, and that $143,827.08 in funds was restrained where SGNY was acting as escrow agent for defendant GROUPAMA TRANSPORT S.A. ("Groupama"). Since the funds at SGNY appeared to be funds maintained in actual accounts belonging to defendant Groupama, and therefore, fell outside of the scope of the Jaldhi decision, plaintiff instructed SGNY to continue restraining them.

Plaintiff had also received notice from other garnishees that they had restrained a number of EFTs originating from defendants. For the reasons discussed more fully below, plaintiff ultimately instructed the garnishees to continue restraining these EFTs originating from defendants.

Prior to the conference addressing defendants' motion to vacate the attachment, on November 3, 2009, plaintiff submitted a letter to the Court briefly setting forth its basis for why the Attachment Order should not be vacated and requesting that it be granted additional time to conduct limited discovery with respect to the relationship between the defendants and their banks, and be permitted to further brief the issue of whether the defendants retained attachable interests in the restrained funds transfers. (See Exhibit "E" to Werner Aff.)

During the November 4, 2009, conference plaintiff provided further explanation of its basis for continuing to restrain funds despite the issuance of the Jaldhi decision and again requested that it be permitted to conduct limited discovery in support of its argument. The Court granted plaintiff's request, directing that the parties engage in limited discovery and appear again before the Court in three weeks to resolve the pending motion to vacate the Attachment Order.

On November 6, 2009, plaintiff served limited discovery demands on defendants' counsel via e-mail seeking information and documents relating to the relationship between the defendants and the banks which had originated the restrained funds transfers. (See Exhibit "F" to Werner Aff.")

More recently, on November 13, 2009, the Second Circuit issued its decision in Hawknet, Ltd. v. Overseas Shipping Agencies, 2009 U.S. App. LEXIS 24970 (2d Cir. Nov. 13, 2009), holding that the Jaldhi decision must be applied retroactively to pending maritime attachment actions.

Throughout this period, plaintiff continued to receive notice from garnishees that they had restrained additional funds transfers originating from defendants, and in response plaintiff continued to instruct the garnishees to maintain their restraint. At present, plaintiff has restrained property of defendants Trygvesta, Groupama and INTERNATIONAL INSURANCE COMPANY OF HANNOVER ("Hannover"), in the total amounts of $381,544.40, $339,367.90, and $339,367.90, respectively. (See Exhibit "C" to Werner Aff.)

# ARGUMENT

## POINT I

### PLAINTIFF HAS MET ITS RULE E(4)(F) BURDEN UNDER AQUA STOLI

To the extent that defendants seek vacatur of the Attachment Order, such relief should be denied. Plaintiff has carried its burden to demonstrate that the Attachment Order was validly issued. Under Supplemental Rule B, an order of maritime attachment must issue upon a minimal prima facie showing that the defendants cannot be found in the District in which the assets are sought to be attached. Supplemental Rule B provides, in pertinent part:

> If a defendant is not found within the district … a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property – up to the amount sued for – in the hands of garnishees named in the process. The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

Supp. R. Adm. or Mar. Cl. & Asset Forfeiture Actions B.

Further, as the Second Circuit explained in Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2nd Cir. 2006) (which remains valid law), in order to meet its burden on a challenge as to the validity of an attachment, a plaintiff need only demonstrate that the attachment order was properly issued, *i.e.*, (1) that it has a valid *prima facie* admiralty claim; (2) the defendant cannot be found within the district; (3) the defendant's property may be found in the district; and (4) there is no statutory bar.

The Second Circuit emphasized that "Rule B specifies the sum total of what must be shown for a valid maritime attachment." Id. at 447. Moreover, the Second Circuit held that

upon a plaintiff's showing that the attachment was properly ordered, and that it complied with the requirements of Supplemental Rules B and E, the defendants bear the burden of "establish[ing] any equitable grounds for vacatur." Id. at 445. n. 5. Here, the defendants have made no showing whatsoever as to how or why the Attachment Order should be vacated under the standards set forth in Aqua Stoli, supra.

It is also well-settled that the relevant time for determining whether the initial requirements for obtaining an attachment order have been met, is at the time a plaintiff filed its Verified Complaint and Rule B(1) Affidavit in support of the request for issuance of an attachment order – both of which occurred in this action on October 1, 2009 – before the Jaldhi decision was issued. See, e.g., Notes of the Advisory Committee on the 2005 Amendment to Rule B (explaining that "[t]he time for determining whether a defendant is 'found' in the district is set at the time of filing the verified complaint that prays for attachment and the affidavit required by Rule B(1)(b)."); Heidmar, Inc. v. Anomina Ravennate di Armamento Sp.A, 132 F.3d 264 (5th Cir. 1998). In any event, the premises on which the Attachment Order was properly issued on October 9, 2009, remain just as valid today: the defendants continue to be absent from the District, while their property remains present or may soon be present in the District. See POINT III below.

Moreover, the Jaldhi decision does nothing to limit the availability of maritime attachment orders generally or to undermine the validity of previously issued maritime attachment orders. In fact, the Second Circuit made it clear that maritime attachment orders may be issued to restrain, among other things, a defendant's bank account, a beneficiary's bank from releasing funds where the defendant is the beneficiary, or an originator's bank from executing a payment order initiated by a defendant. Jaldhi, supra, 2009 U.S. App. LEXIS 22747, at *25, and

6

33-34. The fact that the Second Circuit ultimately remanded the case to the District Court to determine whether there were grounds to vacate the portion of the attachment order that affects funds transfers originating from the defendant is further evidence that a blanket prohibition on maritime attachment orders was not intended. Id. at *37.

Thus, the Attachment Order still remains a valid means by which plaintiff can continue to seek to restrain properly attachable property of the defendants as security for plaintiff's claims. Since the issuance of Jaldhi, plaintiff has continued to serve the validly issued Attachment Order, and has in fact, restrained properly attachable property of the defendants. Therefore, plaintiff respectfully submits that there is no basis for the Attachment Order to be vacated.

## POINT II

### THE COURT MUST LOOK TO NEW YORK STATE LAW TO DETERMINE WHETHER DEFENDANTS HAVE AN ATTACHABLE PROPERTY INTEREST IN THE FUNDS TRANSFERS

In the wake of Jaldhi a number of Courts have vacated attachments or issued Orders requiring plaintiffs to show cause why attachment of EFTs should not be vacated. The underlying premise behind these acts, appears to be the statement in Jaldhi that New York state law "does not permit attachment of EFTs that are in the possession of an intermediary bank." Jaldhi, supra, 2009 U.S. App. LEXIS 22747, at *33. Plaintiff respectfully submits that this is an incorrect statement of New York law, and therefore, this Court should not be bound by Jaldhi.

New York state law does not absolutely prohibit the attachment of funds transfers while they are in the possession of an intermediary bank. Rather, N.Y. U.C.C. § 4A-502 merely provides that intermediary banks served with attachment orders are "not obliged to act with respect to the process." See, e.g., Palestine Monetary Auth. v. Strachman, 62 A.D.3d 213, 227, 873 N.Y.S.2d 281, 292 (1st Dep't 2009) (explaining that § 4A-502 "allows a bank to honor the process if it so chooses but it does not always have to honor that process"); Consub, supra, 543

7

F.3d at 112 (holding that § 4A-502 "merely provides that intermediary banks need not act with respect to process served upon them – it does not vest the property interest in those funds in the intermediary bank"); Manufacturas Int'l, Ltda v. Manufacturers Hanover Trust Co., 792 F. Supp. 180, 196 (E.D.N.Y. 1992), aff'd, 47 F.3d 1159 (2d Cir. 1995), cert. denied, 515 U.S. 1132, 115 S.Ct. 2557, 132 L.Ed.2d 811 (1995).

It is thus, clear that nothing in the U.C.C. prohibits an intermediary bank from honoring a creditor's process of attachment, and thus, the restraint of funds while in the hands of an intermediary bank is not prohibited under New York law generally. In Palestine, which represents the most recent ruling from a state appellate court on this issue of New York law, which was heretofore undecided, Judge Catterson reversed the trial court's determination that $30 million in funds transfers restrained while in the hands of an intermediary bank had to be released, finding that the attachment did not violate N.Y. U.C.C. §§ 4A-502 or 4A-503 since the originator may have had an attachable property interest in the funds transfers. The First Department ultimately remanded the case to the trial court so that the parties could engage in discovery regarding the relationships between the originator of the funds transfers, their banks and the intermediary banks. The inescapable conclusion to be drawn from the Palestine decision is that under prevailing New York state law EFTs originating from a defendant may be properly attachable under certain circumstances even when they are originally restrained while in the hands of intermediary banks.

Thus, it is also clear that the Second Circuit's interpretation of the state of New York law on this point is flawed. In such a situation, this Court is not required to blindly follow precedent

where it is based on a misapplication of the underlying law.[1] For example, in In re Eastern & Southern Dists. Asbestos Litig., 772 F. Supp. 1380, 1409-10 (W. & S.D.N.Y. 1991), rev'd on other grounds sub nom., In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831 (2nd Cir. 1992), Judge Weinstein disregarded two Second Circuit decisions addressing a point of state law, and instead followed intermediate state court rulings. On appeal the Second Circuit agreed with Judge Weinstein's analysis and in one aspect of the case remanded to await the decision in a pending First Department case (which would be the first state appellate decision on the issue). In re Brooklyn, 971 F.2d at 850-51.

Here, the First Department decided Palestine after the parties in Jaldhi submitted their briefs. The Palestine decision was further, apparently not raised at oral argument in Jaldhi, and was neither cited nor distinguished by the Second Circuit in its written opinion. Because there is no indication that the Second Circuit considered Palestine, this Court must assess plaintiff's position in light of the Palestine decision. See, e.g., Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 543 (1941) (noting that in issues controlled by state law, "the duty rests upon federal courts to apply state law under the Rules of Decision statute in accordance with the then controlling decision of the highest state court."); Huddleston v. Dwyer, 322 U.S. 232, 236 (1944); see also Knox v. The Bank of New York, 508 F. Supp. 2d 249, 250-51 (S.D.N.Y. 2007) (staying action pending outcome of Palestine case, noting that "[t]he Court is persuaded that the pending appeal in *PMA v. Strachman* cautions against resolving the instant motion at this time, in order to prevent the possibility of conflicting rulings [on a matter of state law] and to have the

---

[1] This is particularly true here, where the Second Circuit clearly emphasized that its purpose in issuing Jaldhi was to correct what it had perceived to be an error involving the application of New York state law. Plaintiff respectfully submits that this Court should not further compound the Second Circuit's error.

9

benefit of the Appellate Division's views on the issues in dispute, particularly its views regarding the interpretation of New York state banking law.")[2]

Thus, plaintiff respectfully submits that the Jaldhi decision should be limited to its true holding, which is merely that New York state law governs the issue of whether a particular *res* is a defendant's property. Therefore, to the extent that the Court decides to apply the Jaldhi decision to this action (see POINT IV, below), the only effect that it should have on plaintiff's Attachment Order is that plaintiff may now be required to demonstrate that the property under restraint is validly attachable property of the defendants under New York state law.

## POINT III

### THE FUNDS TRANSFERS UNDER RESTRAINT ARE VALIDLY ATTACHED PROPERTY UNDER NEW YORK STATE LAW

There are two types of property presently under restraint pursuant to the Attachment Order: (1) the bank account and escrow account funds in defendant Groupama's name which are being restrained by garnishee SGNY, and (2) a number of EFTs originating from defendants Trygvesta, Groupama and Hannover which were restrained by garnishees including HSBC Bank USA, N.A., BANA, and Wachovia Bank, N.A.

With respect to the funds under restraint at SGNY, it is clear that such funds are properly attachable bank credits which are within the scope of the Jaldhi decision. See, e.g., Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co., 85 F.3d 44, 46 (2nd Cir. 1996). Similarly, the fact that some of the funds may be being held in an escrow account is also no impediment to their restraint. See, e.g., Starboard Venture Shipping, Inc. v. Casinomar Transportation, Inc.,

---

[2] Incidentally, after remand to the trial court, the Palestine case was appealed again. The First Department conducted oral argument on November 4, 2009, and the parties now await a further decision on the issues surrounding the attachment of the EFTs.

1994 AMC 1320 (S.D.N.Y. 1993), and Gala Enterprises, Inc. v. Hewlett Packard Co., 970 F. Supp. 212 (S.D.N.Y. 1997). Defendants have practically conceded these points.

The real issue thus, arises only with respect to the EFTs originating from the defendants and which have been restrained by the garnishees. The central question is whether the defendants have an attachable property interest in such transfers for the purposes of Supplemental Rule B. As noted above, the Palestine decision explains that under certain circumstances EFTs originating from a defendant can be attached while in the hands of an intermediary bank. Specifically, the Palestine court held that where an intermediary bank voluntarily honors a creditor's process of attachment, the EFT may be attachable by a creditor of the originator of the EFT.

Here, a similar situation is presented. Plaintiff obtained a validly issued Attachment Order which it issued on garnishee banks. Following the issuance of the Jaldhi decision, the garnishee banks were no longer obliged to honor plaintiff's Attachment Order to the extent it sought the restraint of EFTs which were being held by the garnishees while they were acting as intermediary banks. Nevertheless, the garnishees continued to restrain funds and notify plaintiff of the restraint. Plaintiff ultimately advised the garnishees that it wished for the EFTs to remain under restraint.[3]

In any event, by choosing to honor the Attachment Order, the garnishees caused the EFTs in question to become restrained (and likely placed the funds into a segregated account). Under New York law, where EFTs have been interrupted before they could be completed (as was clearly the case here), the originators of the funds transfers retain attachable property interests in

---

[3] This practice was specifically sanctioned by the Palestine court, which noted that the intermediary bank had no obligation to honor such process of attachment. Furthermore, arguments similar to those raised by plaintiff herein, have been advanced by plaintiffs in a number of other actions. See, e.g., Sinoying Logistics Pte Ltd. et al. v. Yi Da Xin Trading Corp. (Philippines) et al., 08 Civ. 3754 (DC); Consub Delaware LLC v. Schahin Engenharia Limitada, 06 Civ. 13153 (SAS); Global Maritime Investments v. Companhia Siderurgica Nacional, 08 Civ. 11199 (SAS).

11

the transfers. For example, the originators retain control over the funds while they are transit, see N.Y. U.C.C. § 4A-302(a)(1), retain a right to have the funds refunded in the event the transfers are interrupted, see N.Y. U.C.C. § 4A-402(d)-(e), and retain the right to recover interest on the funds to the extent that there is a delay in the proper execution of the funds transfers, see N.Y. U.C.C. § 4A-305. See, e.g., Palestine, supra, 62 A.D.3d at 229-30, 873 N.Y.S.2d at 293; Consub, supra, 543 F.3d at 112 n. 4; T. Baxter & R. Bhala, "Proper and Improper Execution of Payment Orders," 45 Bus. Law. 1447, 1461-63 (June 1990).

In reaching the conclusion that the EFTs in question may have been attachable property of the originator, the Palestine court rejected the trial court's finding that once the originator's bank executed the originator's payment orders, title to any funds associated with those payment orders transferred to the originator's bank. Palestine, supra, 62 A.D.3d at 228, 873 N.Y.S.2d at 292-93. Although Judge Catterson initially observed that technically the trial court's conclusion was correct under a "strict reading" of prior New York state court decisions, and was further supported by the official commentary to U.C.C. § 4A-502, he ultimately held that there could be a basis for the EFTs to remain attachable property:

> Here, however, a further step is required … before determining that title passed to the [originator's bank], that is, to ascertain the relationship between the [originator] and the [originator's bank]: If the [originator's bank], under the correspondent bank relationship with [the intermediary bank], is merely an agent for collection for its depositors then, title did not pass to the [originator's bank].

Palestine, supra, 62 A.D.3d at 229-30, 873 N.Y.S.2d at 293.

Whether a bank is acting as an agent for collection at a particular point in a transaction is of considerable importance in banking law, since it determines who will bear a loss of the funds, whether the funds will be subject to F.D.I.C. insurance, the relative property rights of the bank and its customer to the funds, and a whole host of other issues. Unless otherwise agreed between

12

a bank and its customer, where an item is deposited or received for collection, the bank is acting as an agent for collection. The alternative would be for the bank to become a debtor to its customer when items are deposited or it collects funds on behalf of its customer.

From the limited discovery obtained so far from defendants, it appears that some of the transfers initiated by Hannover were sent via its Swedish bank Handelsbanken, while others were sent by National Westminster Bank Ltd. in London. Defendant Groupama appears to use Citibank Singapore as its originating bank, and of course, also maintains accounts at SGNY. Finally, defendant Trygvesta appears to have used Nordea Bank as its originating bank. The fact that none of these banks, including the garnishees, have entered an appearance in this action seeking to challenge the attachment is evidence that they are merely acting as agents for collection when they are receiving credits as part of an EFT chain.

The fact that defendant's originating banks and garnishees have no property interests in the EFTs is further evidenced by the fact that the banks in seeking to overturn <u>Winter Storm</u>, complained only of administrative burdens, disruptions, and costs, not any potential substantive liability for the attachments. It is therefore, highly likely that the garnishees and their customers, including the defendants' originating banks, have agreements in place governing their EFT obligations, which specifically disclaim any property interests in the case where the transfers become subject to attachments or garnishments. Limited research has revealed that at least some banks have entered into wire transfer agreements containing such provisions.

A further possibility is that the garnishees' restraint of the EFTs for several weeks now may have caused a change in the status of the EFTs or the property interests the defendants have in them. To the extent that the EFTs may have been placed by the garnishees into a suspense

13

account or other stationary account, such action may have rendered them attachable property under New York state law, akin to ordinary bank accounts.[4]

Finally, it is clear that in the event the EFTs under attachment are released by the Court, the funds would ultimately be released to defendants. Thus, common sense dictates that defendants have a beneficial, contingent or reversionary property interest in the EFTs. This interest is not only attachable, but has already been attached by subsequent service of the Attachment Order on the garnishees. This attachable property is similarly supported by the fact that if plaintiff were permitted to take possession of the EFTs in satisfaction of any judgment it obtains against defendants, it would be defendants who would bear the loss, not the their banks or the garnishees. Admiralty courts have regularly recognized that such a defendant's interest in property is attachable, even though the defendant may not strictly speaking have "title" to such property.[5]

In sum, (a) there was no defect in the original Attachment Order itself, which simply instructed garnishees to freeze "all tangible or intangible property" belonging to defendants, (b) under the U.C.C., the garnishees acting as intermediary banks had the option of refusing to continue processing the EFTs for any reason, (c) once the garnishees chose, for whatever reason, to stop the EFTs, the funds became refundable with interest by operation of New York law and thereby properly attachable under Supplemental Rule B, (d) neither the garnishees nor the

---

[4] There are strong reasons to believe that the garnishees here have in fact debited the amount of the EFTs into separate suspense accounts, rendering them nothing more than ordinarily attachable bank credits. See, e.g., Affirmation of Christopher R. Nolan dated November 9, 2009, filed as Docket Entry No. 36 in Sinoying Logistics Pte Ltd. et al. v. Yi Da Xin Trading Corp. (Philippines) et al., 08 Civ. 3754 (DC) (describing use of such suspense accounts by garnishees including HSBC Bank USA, N.A., BANA and Wachovia Bank, N.A.)

[5] See, e.g., Petrohawk Energy Corp. v. Law Debenture Trust Co., 2007 U.S. Dist. LEXIS 5803 (S.D.N.Y. 2007); Tarstar Shipping Co. v. Century Shipline Ltd., 451 F. Supp. 317, 324 (S.D.N.Y. 1978); Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 31 F.2d 265 (2d Cir. 1929); Vamvaship Maritime Ltd. v. Shivnath Rai Harnarain (India) Ltd., 2006 U.S. Dist. LEXIS 21114 (S.D.N.Y. 2006); Gala Enterprises, Inc. v. Hewlett Packard Co., 970 F. Supp. 212, 217 (S.D.N.Y. 1997); see also Astrea United Investments, L.P. v. B.T. Onitiri, 1992 U.S. Dist. LEXIS 17586, *8 (S.D.N.Y. 1992); Koroleski v. Badler, 32 A.D.2d 810, 303 N.Y.S.2d 221 (2d Dep't 1969); U.R.C., Inc. v. Applied Images, Inc., 431 N.Y.S.2d 859, 860 (Sup. Ct. Nassau Co. 1980).

14

defendants' banks objected themselves to the attachment on the grounds that they had an interest in the funds, (e) if the funds were released, the garnishees would have to initiate a new transaction to return the funds to defendants, and in any event would be sent to the defendants in all likelihood, and (g) the application of the funds to a judgment for plaintiff would be a loss for defendants not defendants' bank or any intermediary banks.

Thus, it is plaintiff's position that the defendants continue to have a property interest in the EFTs and that therefore, the EFTs remain attachable property for the purposes of Rule B, even post-Jaldhi.

## POINT IV

### THE APPLICATION OF JALDHI TO THIS ACTION WOULD BE INEQUITABLE

Plaintiff concedes that as a general matter, the decisions of the United States Supreme Court and the Courts of Appeals are retroactive, see e.g., Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 125 L. Ed. 2d 74, 113 S. Ct. 2510 (1993) and Margo v. Weiss, 213 F. 3d 55 (2nd Cir. 2000). Moreover, plaintiff further concedes that with the Second Circuit's recent decision in Hawknet, Ltd. v. Overseas Shipping Agencies, 2009 U.S. App. LEXIS 24970 (2nd Cir. Nov. 13, 2009), it appears clear that the intention of the Second Circuit is that the Jaldhi decision be applied retroactively. Nevertheless, plaintiff submits that the retroactive application of the Jaldhi decision to this case would be inequitable, and therefore, respectfully requests that the Court exercise its inherent equitable powers to shape the manner in which the Jaldhi decision is applied in this action so as to minimize the harm suffered by plaintiff.

As the Second Circuit has explained "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge, and not to the circuit judges sitting in review." Greenwich Marine,

15

Inc. v. S.S. Alexandra, 339 F.2d 901 (2nd Cir. 1965).  See also Swift & Co. Packers v. Compania Colombiana Del Caribe, 339 U.S. 684, 691-92, 94 L. Ed. 1206, 70 S. Ct. 861 (1950) ("We find no restriction upon admiralty by chancery so unrelenting as to bar the grant of any equitable relief even when that relief is subsidiary to issues wholly within admiralty jurisdiction."); Key Bank of Wash. v. S. Comfort, 106 F.3d 1441, 1444 (9th Cir. 1997) ("A district court sitting in admiralty has equitable powers to do substantial justice.") (internal quotation marks and citation omitted); Inland Credit Corp. v. M/T Bow Egret, 552 F.2d 1148, 1153 n.6 (5th Cir. 1977) (noting that "admiralty courts are much freer today than they may have been in the past to rely upon equitable principles to solve questions which arise in cases whose core is traditionally maritime"); Supplemental Rule E(6) (providing that, "whenever security is taken . . . and if the surety shall be or become insufficient, new or additional sureties may be required on motion and hearing").

Plaintiff relied on the fact that security for its claims had been obtained in New York, in continuing to proceed with its Danish litigation and in foregoing attempts to seek alternative security for its claims.  Thus, pulling the rug out from under plaintiff now, by vacating the Attachment Order would work a tremendous injustice to plaintiff.  After plaintiff has expended so much time and expense to pursue its rights, this Court should not deny plaintiff the relief to which it clearly was entitled under the law as it existed at the time this action was commenced.

## CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that this Court deny defendants' motion in its entirety, and award such other and further relief as the Court may deem just and proper.

Dated: November 23, 2009
New York, New York

>LYONS & FLOOD, LLP
>Attorneys for Plaintiff
>KYODO SHIPPING, LTD.

By: _____
Kirk M. Lyons
Jon Werner
65 West 36th Street, 7th Floor
New York, New York 10018
(212) 594-2400

U:\kmhldocs\2686002\Motions\MOL-OppVacate.doc

**CERTIFICATE OF SERVICE**

Jon Werner, an attorney duly admitted to practice before this Honorable Court, affirms on this 23th day of November 2009, I served true copies of the foregoing, via CM/ECF and by e-mail to:

>Nicoletti Hornig & Sweeney
>Attorneys for Defendants
>Wall Street Plaza
>88 Pine Street
>New York, NY 10005
>
>Attn.: James F. Sweeney, Esq.
>jsweeney@nicolettihornig.com

                                                                                           _____
                                                                                           Jon Werner

U:\kmhldocs\2686002\Motions\MOL-OppVacate.doc